MARTHA J. FITZGERALD et al. Plaintiffs in Error, vs. GEORGE W. ALLEN et al. Defendants in Error.

*Opinion filed April 23, 1909.*

1. DEEDS—*test of mental capacity necessary to make a valid deed.* The test of mental capacity necessary to make a valid deed is that the grantor be capable of understanding in a reasonable manner the nature and effect of the act in which he is engaged, and if he is capable of properly transacting ordinary business affairs in which his interests are involved he may be regarded as competent to dispose of his property by deed.

2. SAME—*when fact that grantor was at one time a victim of melancholia does not show want of capacity.* The fact that the grantor, some ten years before making the deed, was for a time afflicted with melancholia and attempted suicide on several occasions does not show that he was not competent to make the deed, where the evidence shows that he had recovered from such attack and that for the last ten years of his life he transacted ordinary business and protected his interests in such transactions.

3. SAME—*what tends to weaken opinion evidence as to mental capacity.* Opinion evidence that the grantor was not competent to make the deed in question is weakened by the fact that many of the witnesses admitted that in business transactions of which they had knowledge the grantor acted in a business-like manner and seemed to understand what he was about, while other of the witnesses transacted with him, without question, business involving loans of money, the giving of notes and the sale of property.

4. SAME—*influence which is not wrongful does not avoid deed.* Undue influence which will avoid a deed or will must go to the extent of depriving the grantor or testator of his free agency, and influence which is merely the result of affection and which is not wrongfully exerted is not ground for avoiding a deed.

5. SAME—*mere relation of parent and child does not raise presumption that parent's deed to child is invalid.* The mere fact of relationship does not raise any presumption that a deed from parent to child is invalid as the product of fraud or undue influence by the child; but such presumption obtains where, in addition to such relation, there is proof of a confidential relation in which the child dominates the parent.

6. SAME—*what does not establish undue influence.* The facts that the grantee in a deed from father to son has had for many years the active management of his father's farm and that the latter has largely followed the son's advice in business matters do

not establish undue influence such as will avoid the deed, which was made by the father when the son was not present, and which, so far as appears, was the free will and act of the father.

7. SAME—*when delivery of deed in escrow is sufficient.* A deed delivered in escrow by the grantor to his attorney, to be delivered to the grantee at the grantor's death, is well delivered where the grantor, by a contemporaneous instrument, relinquished all control over the deed, and the grantee signed an agreement reciting the facts relating to the execution and delivery of the deed and specifying the undertakings to be performed by the grantee as the consideration for the conveyance.

8. SAME—*unauthorized delivery of a deed may be ratified.* A deed procured without delivery by the grantor or delivered by a third party without the knowledge or authority of the grantor may be ratified by the grantor so as to vest a good title in the grantee.

WRIT OF ERROR to the Circuit Court of Greene county; the Hon. JAMES A. CREIGHTON, Judge, presiding.

VAUGHN & CHAPMAN, for plaintiffs in error.

RAINEY & JONES, and THOMAS F. FERNS, for defendants in error.

Mr. JUSTICE CARTER delivered the opinion of the court:

This was a bill filed in the circuit court of Greene county by some of the heirs-at-law of Elisha W. Allen to set aside a deed made by said Allen to his son George W. Allen, one of the defendants in error. Two of the other children of Elisha W. Allen were made defendants along with George. The complainants also asked for partition of the premises among all the heirs. As the bill was finally amended and passed on by the chancellor, the deed is sought to be set aside on the ground of undue influence, lack of mental capacity, want of consideration and want of proper delivery. The case was referred to a master in chancery and a large amount of evidence taken, making a record of something over two thousand pages. On a hearing the trial court entered a decree dismissing the bill for want of

240—6

equity. The case was thereafter brought to this court by writ of error.

The circumstances connected with the making of the deed, as detailed by the attorney who drew it, were substantially as follows: July 20, 1903, Elisha W. Allen came, with his son George, to the law office of Henry T. Rainey, at Carrollton, and stated that he wished to convey to George his farm. At the attorney's request George Allen left the building and went down on the street, and was not present at any of the further business that day until he was called in during the afternoon to sign the acceptance hereafter referred to. Elisha W. Allen then explained to Mr. Rainey that he desired to convey the farm and other real estate and personal property to George, and wanted George to agree to make certain payments to the other heirs at Elisha's death. After taking down the data Mr. Rainey instructed Mr. Allen to go to Dr. Burns and ask as to his (Allen's) mental condition, which he did. Mr. Rainey drew up the deed in question from the descriptions in tax receipts and other information furnished by Mr. Allen, and also dictated to his stenographer an instrument concerning the personal property and other matters, referred to later. When Elisha W. Allen returned, the documents were read to him and their contents explained, and he acknowledged them before A. Connole, notary public and justice of the peace. Thereupon Mr. Rainey, at Mr. Allen's request, burned a will that the latter had executed two or three years before that time. The two papers were afterwards sealed in an envelope by the witness and placed in a safe in a package of wills. During the afternoon of that day Mr. Rainey met George Allen on the street and asked him to come to the office and sign an acceptance of the terms of the instrument, which George did. Thereafter Mr. Rainey, who was congressman from that district, explained to his law partner, Mr. Jones, that if Mr. Allen should die while Mr. Rainey was at Washington Mr. Jones should deliver the deed to George

Allen. Elisha W. Allen did die while the congressman was at Washington, and Mr. Jones, under the written directions from his partner, delivered the deed. Dr. Burns, to whom Mr. Allen went to inquire as to his mental condition before signing the deed, testified that he had treated him from about 1899 until shortly before his death for various troubles; that Mr. Allen came to his office on the day in question and stated that he was about to transact some important business and asked if the doctor thought his mental condition was such that he could properly do it. The doctor then said he thought he was capable of attending to the business, and he testified at this trial that he was still of that opinion. Connole, who took the acknowledgment of the deed and witnessed the other instrument, testified that they were read and explained to Mr. Allen in his presence; that he had known Allen several years before this transaction and that he was at that time competent to transact his ordinary business; that he "seemed to be all right."

The deed from Elisha W. Allen to George W. Allen was dated July 20, 1903, and conveyed and warranted, for a consideration of one dollar and other good and valuable consideration, about 390 acres of land and a house and lot in the village of Kane, all in Greene county. It was recorded November 21, 1905. It appears that the home farm consisted of about 160 acres of good land, valued at from $90 to $100 per acre, and a farm on the bottoms of Macoupin creek of some 230 acres, valued at about $40 per acre. The village property was that bought for his widowed daughter, Mrs. Gibbons, hereafter referred to. By the other instrument, executed in conjunction with the deed, Elisha W. Allen conveyed to his son George W. Allen all his personal property, with the understanding that a personal transfer was made "so as to render a formal bill of sale unnecessary." The instrument also recited the revocation, by burning, of the former will, and directed that said George W. Allen, at the maker's death, should pay to Mat-

tie Fitzgerald, Fannie Race, Julia Gibbons, Anna Woolsey, daughters, and Goldie Allen, grand-daughter, each $500 in cash, and that he also convey to Julia Gibbons the house and lot in Kane, and that he pay to Alvin Allen $1000 and also give him a good wagon and team and a good set of double harness. In relation to the deposit of the deed in escrow this instrument states as follows: "And I have this day executed to my said son George W. Allen a warranty deed, conveying to him, in fee simple, all my real estate, and I have deposited said deed in escrow with Henry T. Rainey, of Carrollton, Illinois, to be by him delivered to my said son George W. Allen at my death, and I hereby certify that I have relinquished all control over said deed so deposited with said Henry T. Rainey, and I fully understand that I cannot revoke the same in any manner nor recall the same in any manner from the possession of the said Henry T. Rainey, even if I should at any time in the future desire so to do."

The agreement signed by George Allen reads as follows: "In consideration of the fact that my father, Elisha W. Allen, has this day deeded to me all his real estate, consisting of about 390 acres of land, together with the house and lot in Kane, Illinois, belonging to him, said deed being deposited in escrow with Henry T. Rainey, of Carrollton, Illinois, to be by him delivered to me upon the death of my said father; and whereas, he has to-day transferred to me all of his personal property absolutely; now, therefore, I, on my part, agree to provide my father with all the comforts, care and attention to which he has been accustomed for the remainder of his natural life, and I. agree in all respects to fully provide for my said father, and I. fully agree to carry out directions as to payments, etc., to heirs, this·day contained in memorandum signed by my father."

Elisha W. Allen was a farmer and had lived practically all his life in Greene county. He had seven children, who

grew to adult age. One son, John F. Allen, called "Dud," died about 1900, leaving a wife and daughter, Goldie. Elisha W. Allen's wife died June 29, 1903, about three weeks before he executed the deed in question. He himself died November 15, 1905, aged about seventy-four years, leaving as his heirs his grand-daughter, Goldie, and his four daughters and two sons mentioned in the agreement. Mrs. Gibbons' husband was dead and the other three daughters were married and living in the vicinity of their father's place. George Allen was a bachelor, about forty years old at the time of this hearing, and had always lived on the farm in question. The evidence, as has been stated, is voluminous, and it is impossible within proper limits to designate in detail all of the matters upon which plaintiffs in error base their claim of undue influence and lack of mental capacity as affecting the deed in question. In 1892 Mr. Allen was found by his sons down by or in a brook that flowed through the farm, and it was claimed that he intended to commit suicide. The same year he attempted to cut his throat during the night with a small potato knife, inflicting a wound about three inches long in the neck. A doctor was called, who sewed up the wound, and several neighbors came in to assist, and watch Mr. Allen to see that he did himself no further harm. Shortly after this incident, by the advice of Dr. Proctor, who was attending Mr. Allen, and that of Dr. Carriel, an expert on insanity who was called into consultation, it was decided that Mr. Allen should be sent to an asylum. He was taken to the county seat for a hearing, but on account of the fact that the county judge lived in another town and could not get there that day the matter was postponed, and in the meantime, by reason of the objections of some member or members of the family, it was decided to keep their father at home. It was agreed, however, that strict watch should be kept on him by members of the family to see that he did not again attempt suicide. It was testified to that he

purchased, on several occasions, short bits of rope and that they were taken away from him, and that a check-rower rope was also hid to prevent his cutting pieces from that, apparently through fear that he would hang himself. It was also testified to that Mr. Allen in 1892 was continually stating that he was going to starve to death for want of means to buy food, and there is some evidence tending to show that he made such statements for a time thereafter. In the fall of 1903, and again in 1904, Mr. Allen was apparently lost on his own farm not far from the house, and on a searching party being sent out he was found and brought home. It was testified to, however, by some, that his eyesight was poor,—among others, Congressman Rainey, who stated that he had to direct him to the steps when he went out of his office after drawing the papers in question. Dr. Burns testified that he was suffering from corneal ulcers, trachoma and other eye troubles. An affidavit was introduced in evidence showing that at a town election Mr. Allen asked to be assisted in marking his ballot on account of defective vision. About forty-six witnesses testified on behalf of complainants, many of them farmers and merchants in the vicinity of Mr. Allen's home, that in their opinion he was not competent mentally, at the time this deed was executed, to transact ordinary business, such as buying and selling farms and the like, and about the same number testified for defendants in error as to Mr. Allen's mental capacity, stating that from their acquaintance and business dealings with him they believed him able to transact ordinary business at the time the deed in question was executed, many of them testifying to transactions they had had with him during the last few years of his life, and in which he appeared, in their judgment, to take his part in a sensible manner.

The evidence shows that up to the time Mr. Allen tried to commit suicide, in 1892, he was in charge of the farm and all his business affairs, being a shrewd buyer, and that

he had accumulated most of the property by his own ef-
forts. After that time the general control appears to have
been turned over to George Allen. Alvin, the other·son,
was evidently not a very successful business man and had
to be helped considerably by his father, and some of Alvin's
creditors apparently got into the habit of looking to the
father for the payment of the son's bills. The daughters
were married, and, except Mrs. Gibbons, lived with their
families in the vicinity, calling at their parents' home from
time to time. Mrs. Gibbons was separated from her hus-
band some time before his death and lived for a time with
her children at the farm, afterwards living in the house
which her father purchased for her in Kane. George evi-
dently looked after the farm and did the larger part of the
hiring and directing of the help,—not only in working the
farm but in making improvements,—paid most of the bills
for household supplies and handed out to his father spend-
ing money from time to time. · Mr. Allen, however, was
accustomed to draw small checks, usually not over a few
dollars each, which were honored at the bank, but the ac-
count for a number of years prior to his death appears to
have been in George's name. Quite a number of notes
were introduced in evidence signed by Elisha W. Allen and
George Allen, or by Elisha W. Allen alone, some of them
for amounts of several hundred or a thousand dollars.
These notes were given and paid after Mr. Allen's attempt
at suicide, in 1892.

The most serious contention of the plaintiffs in error is,
that the grantor was without sufficient mental capacity to
execute the deed in question. The test of mental capacity
necessary to make a valid deed is that the grantor is capable
of understanding in a reasonable manner the nature and ef-
fect of the act in which he is engaged. (*Ring* v. *Lawless*,
190 Ill. 520, and cases cited.) That he has such capacity
may be shown by proof that he is capable of transacting
ordinary business affairs wherein his interest is involved.

If he has mental power to comprehend and protect his own interests in such ordinary business affairs, the tribunal to whom the question is submitted may regard him as competent to understand the nature and effect of the act of disposing of his property by deed. (*Ring* v. *Lawless, supra.*) The evidence on this subject is very voluminous and conflicting. Some of it has been heretofore set out. The testimony of some of the witnesses for plaintiffs in error on this question is in some degree neutralized by the fact that they did business with Elisha W. Allen in the last ten or twelve years of his life as if he were mentally competent. Mrs. Fitzgerald, one of the daughters, took a note for $1125 signed by him in 1893. The husband of Mrs. Fitzgerald loaned money held by him as guardian, to Elisha W. Allen and took notes therefor only a few years before the deed in question was executed. While there is much opinion evidence for plaintiffs in error that Elisha W. Allen was not competent to transact business, yet in almost every instance if the witnesses were familiar with any business he had transacted they admitted that he did it in a business-like manner and seemed to understand what he was about. There is much positive and uncontradicted evidence in the record that in the last years of his life he transacted business of such a character that it was manifest he was capable of transacting ordinary business. L. W. Reed testified that he had loaned him money at various times down to 1899, and that the business with reference to these loans was not concluded until 1903, and that on every occasion the loan was negotiated by Elisha W. Allen and that in his talk about these matters his conversations were always rational and business-like. Several merchants who sold him goods at different times,—some of them as late as 1904,—a nurseryman who sold him trees for an orchard in 1898, and a doctor who treated him in the fall of 1896, considered that he was capable of transacting ordinary business. A banker at Jerseyville who loaned Mr. Allen money and

cashed his checks for a number of years, as late as 1904, stated that Mr. Allen always attended to his business properly and in a business-like manner. Louis Hulin, who acted as an arbitrator in a fence controversy between Mr. Allen and his neighbor, McMahon, in 1902, testified that Mr. Allen showed the surveyor the corners of the farm, and located the monument most in dispute in the bed of a brook, within a foot of where it was afterwards found to be. In 1901 Elisha W. Allen wished to provide a home for his daughter Mrs. Gibbons, who was living apart from her husband, and went to one Notson and asked the price of a house in Kane. After two visits Mr. Allen succeeded in getting the price reduced from $500 to $400. He borrowed the money from Mr. Christy in Kane and told him what he wished to do with it. When this loan came due, a year later, he asked for and obtained an extension of time, and Mr. Christy testified that he believed Allen was of sound mind and would not have made the loan otherwise. After he purchased the place his daughter moved into it, and from time to time he bought fuel, groceries and clothing for her family, and when it came to a final disposition of his property he provided that his son George should deed this place to Mrs. Gibbons. In 1901 he went to Jerseyville in order to buy a home for his son Alvin and family, calling there upon one William Hutcheson and negotiating for a small house and lot, subject to a mortgage, the equity being valued by the owner at $325. Mr. Allen made three visits to Jerseyville, attempting every time to get the price reduced, and when he was not able to do so finally purchased the property, looking after all the details as to the title, abstract, etc., and paying for the premises himself, in cash. In April, 1903, Alvin's wife died, and in June, 1903, the wife of Elisha W. Allen died. Shortly after the death of these two women, on July 3, 1903, Elisha W. Allen went to Jerseyville to see about the debts his son Alvin had contracted there since he bought the place. He found a num-

ber of bills outstanding, including funeral expenses and grocery accounts. The creditors of Alvin, knowing the financial responsibility of Elisha W. Allen, tried to get him to pay these several debts and he declined to do so, stating that he desired to sell Alvin's home and wished to have the debts paid out of the proceeds of sale. He asked certain of the parties to find a purchaser. The property shortly thereafter was sold and the father made all the arrangements with reference to the sale and settling up of the debts owed by his son, giving a list of the creditors and asking that they be notified, so that the whole matter could be properly closed up. It took practically all the selling price to pay these claims. Alvin then moved back to the home of his father on the farm. It will be noted that this transaction took place at about the time of the execution of the deed here in question.

We think it may be conceded that the evidence shows Elisha W. Allen was mentally incapacitated for the purpose of business at the time he attempted to commit suicide, in 1892, but we think the proof also shows clearly that shortly thereafter he recovered from his attack of melancholia, which, the physicians testified, affected him at that time. There is testimony in the record by one of the daughters and several of the grandchildren that shortly after his wife died he thought that broken glass and bugs were in the victuals prepared for him by one of his grandchildren and that he was afraid of being poisoned. One of the grandchildren also testified that about 1904 he sat up one night with Mr. Allen, who was sick, and on that occasion Mr. Allen asked him if he would go and get Alvin's children and kill them. It is argued that these statements show that he had insane delusions. We find no evidence in the record corroborating this evidence asking to have the children killed. The grandson who testified as to that fact stated that his grandfather made no actual effort, then or afterwards, indicating that he wanted the request carried out

and did not again refer to it. This might reasonably be set down as an expression of peevish exaggeration of the feelings of a sick old man toward his grandchildren. The testimony as to the bugs and glass in the food might be explained as a mere eccentric desire to complain of the food set before him, rather than as an insane delusion that he was being poisoned. As this was in the summer time, it is quite possible that bugs had fallen or crawled into the food. When Alvin, with his family, and Mrs. Gibbons with her several children, at various times came back to the old home to live with the father, it is not unnatural that the old gentleman was not entirely pleased with such an arrangement and was very apt to be impatient, at times, with the grandchildren. Had it not been for Mr. Allen's attack of melancholia and attempt at suicide in 1892, we are impressed with the belief that most of his acts now testified to as showing mental unsoundness would have passed unnoticed, and those things which are now relied on to show insane delusions would have been considered mere whims or eccentricities, due to old age and physical weakness. The evidence as to his buying pieces of rope occurred so long before the execution of the deed that it has little bearing on the question. The fact that during his wife's illness, which occurred a few weeks before the deed in question was executed, he had very little to do with her care and nursing and did not go to the cemetery when she was buried, we think is reasonably explained by the evidence in the record. Dr. E. G. Proctor, who sewed up the wound in Mr. Allen's neck after the attempt at suicide, in 1892, and who seems to have been fully conversant with the circumstances occurring about that time, including the attempt to send him to the asylum, and who also treated him during his last illness, testified that in his opinion Mr. Allen, at the time of making the deed, was capable of transacting business; that he considered he had fully recovered in mental condition.

Counsel insist that it is extraordinary that Mr. Rainey, if he thought Mr. Allen was capable of transacting the business in question, should have sent him to a doctor for examination as to his mental condition. Mr. Rainey's explanation on this point seems to us satisfactory,—that is, that Mr. Allen had usually come to his office in company with Mr. Fitzgerald, one of the sons-in-law, until a few months before the making of the deed in question, and after that he had come with his son George, and the witness had reason to believe there was not the friendliest feeling between the two, and felt that no matter what Mr. Allen did with his property, at his age, there would be some litigation about it. The evidence shows that he was physically weak during the last year of his life and that he left much of his business affairs to be conducted and controlled by his son George, though there is much evidence that he himself conducted a number of business transactions every year from 1893 until the deed was executed by him. During all that time there is no question, from the evidence, but that he conducted all business affairs that he looked after, keenly and shrewdly, and that no one gained the upperhand of him in a trade. We think the weight of the evidence shows that when he executed this deed and agreement he understood fully the nature and effect of the acts in which he was engaged. It is impossible to believe the testimony of Mr. Rainey, and the justice of the peace who took the acknowledgment, and Dr. Burns, who examined him that day, and reach any other conclusion.

The further contention is made that this deed was procured through the undue influence of the son George. The influence which vitiates a will must be wrongful. Influence secured through affection is not wrongful, and when a will is made in favor of a child at his solicitation and because of partiality, influenced by affection for him, it will not be void because of undue influence. (*Dowie* v. *Sutton*, 227 Ill. 183; *Dickie* v. *Carter*, 42 id. 376.) Neither is there

any presumption of law that a conveyance from a parent to a child, from the mere fact of relationship, is the product of fraud; and in order to set aside the conveyance upon such grounds there must be proof of fraud or undue influence in fact, (*Hudson* v. *Hudson,* 237 Ill. 9,) or evidence of confidential relation. (*Mayrand* v. *Mayrand,* 194 Ill. 45; *Morgan* v. *Owens,* 228 id. 598.) Undue influence which will avoid a deed or will must go to the extent of depriving a party of free agency, (*Francis* v. *Wilkinson,* 147 Ill. 370,) and such influence must operate at the time of the transaction sought to be impeached. (*Scars* v. *Vaughan,* 230 Ill. 572.) George was not present at the time the deed was drawn, and there is no evidence of any character to indicate that the transaction was not the result of the free will and act of the father. Indeed, the testimony of Mr. Rainey, and the justice of the peace who acknowledged the deed, shows beyond question that it was the free act and deed of Elisha W. Allen. Under the circumstances in this record, the testimony showing that George, for years before his father's death, had active management of the farm and the father very largely followed his advice in all business matters, does not, we think, establish undue influence, as that term is used in the law.

Plaintiffs in error further contend that there was never any proper delivery of the deed; that Mr. Rainey was the agent or attorney of Elisha W. Allen, and that his custody of the deed was the custody of the grantor and was revoked by the death of Mr. Allen; that the deed could have been withdrawn from his custody at any time by the grantor, as George Allen had not assented to the conditions upon which it was given. Counsel, in support of this point, cite *Dagley* v. *Black,* 197 Ill. 53, and *Barrows* v. *Barrows,* 138 id. 649. In both of those cases it appears that the grantor never lost control of the deed, and it was held essential to the delivery of a deed in escrow that it pass beyond the dominion and control of the grantor, and that it is not so beyond the

control if handed to the grantor's agent to be delivered to the grantee, as the possession of the agent is the possession of the grantor, and the deed might be revoked at any time until the delivery is consummated. (11 Am. & Eng. Ency. of Law,—2d ed.—p. 337.) A deed has been said to be delivered as an escrow where the delivery is conditional,— that is, where it is delivered to a third person to keep until something is done by the grantee or some other person, and it is of no force until the condition be performed. (*Stone* v. *Duvall*, 77 Ill. 475.) The third person must be someone who is not a party to the deed. (1 Devlin on Deeds,—2d ed.—sec. 312; 16 Cyc. 561.) The intention of the grantor is the controlling element in respect to the sufficiency of the delivery of a deed in escrow. (*Shults* v. *Shults*, 159 Ill. 654.) The question of such delivery is one both of law and of fact, and from the facts and circumstances of the transaction the legal question as to the delivery is to be determined. (*Shults* v. *Shults, supra.*) The most that can be claimed by plaintiffs in error, under the authorities, is that the delivery in escrow was not consummated previous to George's acceptance of the conditions set forth in the accompanying agreement. After such acceptance the grantor was without power to revoke. The following authorities, among others, tend to support this conclusion: *C., W. and Z. Railroad Co.* v. *Iliff*, 13 Ohio St. 235; *McDonald* v. *Huff*, 77 Cal. 279; *Davis* v. *Clark*, 58 Kan. 100; *Day* v. *Lacasse*, 85 Me. 242; *Tyler* v. *Cate*, 29 Ore. 515; 2 Jones on Real Property, chap. 29. Moreover, if there was any informality in the original transaction, the agreement was ratified by both grantor and grantee during the two years and more that intervened between the giving of the deed and the death of the grantor. All the evidence in the record indicates that the father turned over to his son full possession and control of his personal property, and that George cared for and supported his father, during his lifetime, in accordance with the agree-

ment. If Elisha W. Allen during his life had endeavored to regain possession of this deed by legal proceedings, based upon the question of delivery, and eliminating the questions of mental capacity, lack of consideration and undue influence, it seems plain that he could not have accomplished his desire. A deed procured without delivery by the grantor may subsequently be ratified by him so that good title becomes vested in the grantee. (*Phelps* v. *Pratt,* 225 Ill. 85.) A delivery to a third party, even when the deed was made without the grantee's knowledge, is good when afterward ratified by the grantee. (*Morrison* v. *Kelly,* 22 Ill. 609; *Cook* v. *Patrick,* 135 id. 499; *Haenni* v. *Bleisch,* 146 id. 262.) That it was the intention of the grantor to leave this deed in escrow with Mr. Rainey at the time he signed and acknowledged it is clear, and it is just as clear that his actions after the acceptance by George ratified the original delivery, if a ratification was necessary.

Mr. Rainey testified before the master as to the circumstances of the preparation and signing of the deed and accompanying agreement. After the evidence was taken before the master, counsel for plaintiffs in error amended their bill, alleging there had been no delivery. Thereafter, over the objections of plaintiffs in error, Mr. Rainey testified before the chancellor more in detail as to what occurred in the preparation of these documents. Counsel for the plaintiffs in error insist that his testimony given before the chancellor is not in harmony with that given by him before the master. We do not think the testimony given on the two occasions conflicts in any material manner. In this connection it is insisted that counsel who try a case should not testify therein. Our views on this subject are set forth in *Wilkinson* v. *People,* 226 Ill. 135, and *Bishop* v. *Hilliard,* 227 id. 382. The part, however, that counsel who testified in this case has taken with reference to the trial is not sufficiently clear from the record or briefs to justify us in drawing any conclusions in this special instance.

Our conclusions on the other branches of the case render it unnecessary for us to discuss the question of consideration, except to say that we deem the proof shows such consideration was adequate and sufficient to support the deed.

The decree of the circuit court will be affirmed.

*Decree affirmed.*