## Lexington & Eastern Railway Company v. Napier's Heirs, et al.

(Decided October 29, 1914.)

### Appeal from Perry Circuit Court.

1. **Deeds—Void—Voidable—A** deed by one mentally incompetent is not necessarily void, and, unless there was unfairness or injustice, the deed should not be set aside.
2. **Evidence—Preponderance—Chancellor's Judgment.—Where** the evidence sustains the finding of the chancellor, the same will not be disturbed.
3. **Estoppel—Heirs Not Estopped to Set Aside Deed.—The** heirs of a grantor in a deed are not estopped from seeking to set aside a deed for inadequate consideration and mental incapacity, where there was no representation that the old man was sane or competent and the party affected thereby was not ignorant of his condition, but had notice of the fact, and it is apparent acted contrary to the intention of the children, and was not induced to such action by any representation they made, and there was reasonable promptness in suing for rescission.

SAMUEL M. WILSON, E. S. JOUETT, WOOTTON & MORGAN and BENJAMIN D. WARFIELD for appellant.

F. J. EVERSOLE, HOGG & JOHNSON, MILLER & WHEELER and JOHN C. EVERSOLE for appellees.

OPINION OF THE COURT BY JUDGE NUNN—Affirming.

On September 1st, 1910, Edward L. Napier and his

wife executed a title bond to the appellant obligating themselves to convey a railroad right-of-way through their farm. The whole farm contained some 600 acres and was situated on the North Fork of Kentucky River. About 75 acres was bottom land. The right-of-way through this farm was a mile long, and the course of it was largely through the bottom land. The amount of land taken was 10 1-5 acres and the title bond called for a payment of $100 per acre. On September 22nd, the railway company paid the consideration stipulated, and Napier and wife executed a deed of conveyance. On November 30th, immediately following, Edward L. Napier, by his next friend (and son), R. C. Napier, sued in equity to cancel the deed and offered to repay the $1,020 consideration. By an amended pleading a cancellation of the title bond was also prayed for. On February 14th, 1911, Edward L. Napier died, being then 85 years of age. He left surviving him his widow, four children and a great many grandchildren, descendants of his deceased children—altogether more than 60 lineal descendants and heirs-at-law. The action was revived in their name.

The ground of rescission is that at the time he made the title bond and deed, and for several years prior thereto, Edward L. Napier was of unsound mind and incompetent to make a deed or contract, and that the appellant knew this fact and overreached and imposed upon him, and secured the conveyance for a grossly inadequate price.

Issue was joined, the proof taken, and on submission the lower court rendered a judgment finding that Edward L. Napier was "of unsound mind, incapable of knowing the value of his property and unable mentally to understand the nature of the deed of conveyance for real property, or a contract to convey the same, or the effect of either, or the effect of a right-of-way for the railroad through his farm; that the sum of $1,020 * * * was wholly inadequate to compensate him for said right-of-way and was, therefore, void * * * the said deed of conveyance * * * and the contract * * * be and the same are each now set aside, canceled and forever held for nought." The judgment then proceeded to recite the fact that the right-of-way was already occupied by the railway company and its track constructed thereupon and it was operating its cars and engines thereover. On the ground of necessity, it was adjudged

"that the strip of land be appropriated to the use of said railway company for its right-of-way, and the court being of the opinion from the evidence in this record that the value of said land and the damage to the adjacent land by reason of the occupancy of said strip for said right-of-way and the extra fencing required is $2,500." Thereupon it was adjudged that the plaintiffs recover of the railway company $2,500 subject to a credit of $1,020 originally paid. From this judgment the railway company appeals and sets up three grounds for reversal: (1) Conceding the mental unsoundness of Edward L. Napier, the contracts were not, therefore, necessarily void, but only voidable upon proper showing of their unfairness or injustice; (2) not only was there no inadequacy of consideration, but the price paid for the right-of-way was entirely adequate; (3) the plaintiffs, who claim as heirs-at-law, are estopped by their conduct to now question the validity of the deed.

As to the first proposition, there is no dispute between the parties. The deed was not necessarily void, only voidable, and unless there was unfairness or injustice, for instance an inadequate consideration, the deed should not be set aside. From the statement of the first ground of reversal, it will be noticed that there is no serious difference between the parties as to the mental condition of Edward L. Napier. For at least three or four years prior to making the deed, he was regarded as mentally unbalanced by his family and neighbors and all who had occasion to observe. There is no conflict in the proof which shows his peculiar conduct and strange hallucinations. His condition was due not only to his advanced years, but to serious spells of sickness.

Coming to consider the second ground of reversal, the Napiers introduced 15 witnesses, and from their testimony it is made to appear that the consideration paid is grossly inadequate. For the appellant, 9 witnesses swear that the consideration paid was fair and reasonable. The sincerity of many of these witnesses is attacked—of the Napiers for the reason that most of them are children and kinsfolks. Against appellant's witnesses it is urged that most of them are in its employ. But each side introduces witnesses who do not appear to have any interest in the result. For the Napiers, this bottom land was estimated as worth from $200 to $500 per acre. For the appellant, it is shown that $100 per acre is fair and reasonable, and some of

them say that such price will compensate for damage to the whole farm in cutting off 30 or 40 acres next to the river from the balance of the farm, and that it is also sufficient to compensate for the extra fencing entailed. The Napier witnesses swear that $100 per acre is not sufficient to cover the actual value of the 10 acres taken; that the extra fencing on one side will cost from $150 to $250, and that the value of this bottom land was damaged from one-third to one-half, or from $30 to $100 per acre. The land through which the right-of-way is surveyed is river bottom, about a mile long. This bottom contains about 70 acres and is a narrow strip between the foot hills and the river. The survey runs diagonally, and the proof shows that a considerable portion of the bottom is left so narrow that it will not justify fencing. If this be true, the effect is to take much more than actually used for the right-of-way. With a few exceptions, appellant's witnesses say the consideration paid for the land was a reasonable price. It is evident that in estimating this value some of them do not consider incidental damage to the farm and bottom land. Others offset such damages by the benefits and advantages that they say will result from building the railroad. This is not the correct measure of damages. The compensation should be for value of land taken and damage to farm as a whole, without deducting anything for benefits or advantages from building the road. Big Sandy R. R. Co. v. Dils, 120 Ky., 563. While the values placed by the witnesses for appellee may seem extravagant to one who has never known that there was much land value in that section except for mining and timber purposes, still their opinions are well fortified by the explanation that rich bottom or tillable lands are very scarce and, therefore, in great demand in the mountains.

Without going further into details on this conflict in the evidence, it is enough to say that there is sufficient evidence to support the finding of the chancellor. In fact, the evidence seems to preponderate in favor of it. Giving to the chancellor's judgment its proper weight, we do not feel authorized to disturb it. His position better enables him to judge of the credibility and sincerity of the witnesses.

The facts with reference to the ground of estoppel are about as follows: The agent of the railway company testified that on the day before the title bond was executed, he went to see old man Napier, and was requested to re-

turn the next day so as to give him an opportunity to get his children, or some of them there; he said that while he held the title, yet the land really belonged to his children and he wanted them there to make the deal themselves. He did return on the next day and there were present two sons, viz.: Stephens Napier and R. C. Napier, the one who instituted the action. J. G. Campbell, a son-in-law, and attorney, was also present, but employed by the railway company in securing rights-of-way over other land in the county for appellant. This agent testifies that old man Napier "then told me he was willing to do whatever his children said for him to do, and after they consulted about the right-of-way, they decided that $100 per acre was what they wanted, and Ed. Napier (the old man) said that whatever satisfied them satisfied him. The contract was then executed and $5 paid on it."

On September 21st this agent passed Napier's house and learned that some of his children would be there next day, as he swears, "for the purpose of seeing about making the deed, and at the old man's request I returned the next day, and there were present besides the two sons above mentioned another son named Dutch Napier, a grandson named W. E. Napier, and Clark Eversole, a nephew." The parties named are among the 60 plaintiffs in the action. Then the agent told them he was ready to take the deed and pay the money. Continuing, he says:

"R. C. Napier told me he thought they ought to have $2,000.00. I told him I couldn't pay any more than the contract price; that I had turned in the contract to the company that his father had executed and that I was bound by that contract and couldn't pay any more; that the company would not allow me to go beyond the contract price in any event, and that he, Napier, ought not to insist that I depart from the contract; that he knew as a business man that I could not do it. He then told me that I could say to the railroad company or officials, that the contract was no good; that Ed. Napier's mind was not good when I took the contract. I told him I wouldn't do that; that we would stand on the contract, and after some talk among us, they all agreed, and the deed was taken and I paid $1,020.00 by draft and the old man, Ed. Napier, turned the draft over to R. C. Napier."

On cross-examination this agent was asked, "Didn't any of them inform you that the old man, Ed. Napier,

had no mind?" and he replied, "After the contract (title bond) was taken, at the time I went to take the deed, R. C. Napier told me that." In answer to further questions, he replied:

"Well, from what I observed, I thought his memory was to some extent impaired * * * and that he himself was afraid of his own judgment and that he wanted his children to assist him and be present before he entered into any contract with me at all. His mind may have been impaired more than I thought it was, because after he told me that he would not make any contract with me until his children were present, I didn't give the condition of his mind any more thought, and having not seen him for some time before this, I probably wouldn't have noticed any change in the condition of his mind."

S. C. Colwell, a deputy county clerk, in the employ of the railroad to take acknowledgments, when asked if it was not a fact, "that old man Napier had scarcely any mind whatever, and had to be tended to just like a child," answered: "That was the common talk." R. C. Napier testifies that on the day the deed was executed he told the agent of the railroad company that his father, "was incompetent to make a deed; that the deed would be no good and not to take any deed, condemn the land through the channels of the court." He admits that he carried the check to town and had it deposited to the credit of his father in the bank, and does not claim to have made any representations to the railroad's agent on the day that the title bond was taken. This testimony is enough to show that those acting for the railroad company knew of the aged condition and mental infirmities of old man Napier, and they were requested by one of his children in the presence of the others, who were there, not to take the deed, but to condemn the land.

As to the elements which must be present in order to constitute estoppel by conduct, appellant quotes as the law of this case Bigelow on Estoppel, 2nd Ed., page 437:

"(1) There must have been a representation or a concealment of material facts.

"(2) The representation must have been made with knowledge of the facts.

"(3) The party to whom it was made must have been ignorant of the truth of the matter.

"(4) It must have been made with the intention that the other party should act upon it.

"(5) The other party must have been induced to act upon it."

We do not believe the facts of this case tend to establish the existence of any of the five elements. There was no representation that the old man was sane or competent. The party affected was not ignorant of the matter, but had notice of the fact, and it is apparent, acted contrary to the intention of the children, and was not induced to such action by any representation they made as to his sanity. Of all the heirs affected, only three or four were present, and as much as they could do was to express their disapproval. The proof shows they did.

Appellant, however, insists that it has been misled to its prejudice, for when the option contract was taken (22 days before the deed was executed) the two children then present remained silent and gave no notice of the old man's mental infirmities nor any warning that objection would be made to a deed he might execute. Appellant says that at the time of the deed, and on November 30th when a refund of the consideration was offered it did not serve to put it in *statu quo,* for then the entire right-of-way had virtually been acquired through the county, and the final location of it depended in part upon the acquisition of the particular section of the right-of-way which passed through this farm. It argues that a return of the consideration, or rescission of the deed might have involved a relocation of the entire road. The facts upon which this argument is based do not appear in the pleadings or proof. We are informed only by briefs that rescission might have involved a relocation of the railroad. As further answer to this, it must be remembered that the deputy county clerk, who was present when the title bond was executed, knew as much about the old man's mental condition as he did when he took acknowledgment to the deed, and the other agent of the railroad company then knew as much about it as he ever did, except the direct notice of disapproval by R. C. Napier, given when the deed was taken. With such knowledge, one deals at his peril. Twenty-two days later this knowledge was certainly established, and a rescission of the title bond then would place the defendant in *statu quo.* For on September 22 it could have resorted to its remedy of condeming the land, just as it had a right to do if this voidable deed had

not been executed. There would be much force in this argument in regard to the children present had they failed to object at the time the deed was taken, or had they delayed bringing the action to rescind.

The judgment of the lower court is affirmed.