## Clay v. Clay's Committee, et al.

(Decided February 26, 1918.)

### Appeal from Bourbon Circuit Court.

1. Insane Persons—Validity of Deed.—The deed of an insane person is not void, but voidable only.

2. Deeds—Cancellation—Insanity.—The deed of an insane grantor will not be set aside unless, in addition to his insanity, there exist other equitable grounds warranting the cancellation of the deed.

3. Deeds—Cancellation—Evidence—Insanity of Grantor.—In an action to cancel deed of an alleged insane grantor, there being such conflict in the evidece as to his insanity as to leave the mind in doubt, the finding of the chancellor that he was insane must be accepted as conclusive.

4. Deeds—Cancellation—Evidence—Inadequacy of Consideration.— In such action, the deed being attacked for the fraud and undue influence of the grantee over the incompetent, by which the land was obtained for an inadequate consideration, evidence held insufficient to show that the price paid was inadequate.

5. Evidence—Competency—Value of Lands.—In such action, evidence of the price at which were sold, in the same vicinity and at or about the same time, lands of like condition as to fertility and improvements as the farm sold, is admissible to prove the value of the land in question.

TALBOTT & WHITLEY for appellant.

EMMETT M. DICKSON for appellees.

OPINION OF THE COURT BY JUDGE CLARKE—Reversing.

In the latter part of February or early in March, 1913, George Clay verbally agreed with S. Brooks Clay, who was his neighbor but not related to him, to sell him his farm of 296 acres in Bourbon county for $12,000.00 cash and eleven annual payments of $2,040 each, with interest thereon from maturity, and the further sum of $5,000.00 payable upon the death of George Clay, who retained a life estate in fifty acres of the land, including the improvements. Shortly thereafter, George Clay had a deed prepared conforming to this contract, which he and his sister, Letitia Clay, who owned the remainder interest in the land, executed and delivered to S. Brooks Clay, who then paid to the grantor, George Clay, the $12,000.00 cash and delivered to him his eleven notes for $2,040.00 each, the grantee taking possession of the land except the fifty acres in which the life estate was reserved.

About four weeks after the delivery of this deed, George Clay became ill and in the following August was adjudged to be of unsound mind. His sister, Letitia Clay, was appointed and qualified as his committee. On November 11, 1913, Letitia Clay resigned as his committee, and H. C. Howard was appointed in her stead, qualified and has been acting as such committee ever since.

Shortly after his qualification as committee, H. C. Howard approached S. Brooks Clay, sought a cancellation or reformation of the deed made by George Clay to him, and failing to reach an adjustment, filed this action seeking a cancellation of the deed, alleging that, at the time of its execution, George Clay was of unsound mind; that the deed was obtained by defendant by the exercise of fraud and undue influence; and that the price paid was grossly inadequate. Defendant traversed the allegations of the petition. After taking the depositions of many witnesses on either side, the case was submitted to the chancellor, who ordered a rescission of the deed and reserved judgment upon the question of rents, improvements, etc. From that judgment, the defendant has appealed.

It has been decided in this state and elsewhere, over and again, that the deed of a person of unsound mind, especially before he has been adjudged a lunatic, is not void but is voidable only. Garland v. Rice, 4 Ky. L. R. 254; Smith's Committee v. Forsythe, 28 Ky. L. R. 1034; Rusk v. Fenton, 14 Bush 490; Dowell v. Dowell, 137 Ky.

167; Logan v. Vanarsdale, 86 S. W. 981; Johnson's Committee v. Mitchell,146 Ky. 383; Bevins v. Lowe, 159 Ky. 439; L. & E. Railway Co. v. Napier's Heirs, 160 Ky. 579; Wathen v. Skaggs, 161 Ky. 600.

The mere fact of insanity, even when clearly proved, is not sufficient ground upon which to authorize a court of equity to set aside a deed; but there must, in addition, exist some other equitable grounds warranting the cancellation. If the price is adequate and the transaction fair, neither the insane grantor nor his committee has an absolute right to have the conveyance cancelled; and only when there is injustice or inequity will a court of equity be authorized or justified in interposing to annul a transaction and to restore the parties to the *statu quo ante*. Unless the grantor, by reason of his insanity or imbecility, has been imposed upon and has suffered some injustice, no reason exists for the cancellation of the deed; and without reason therefor the transaction cannot be disturbed.

In Smith's Committee v. Forsythe, *supra,* it was said:

"The evidence is too convincing that Smith did not have mind enough to understand the nature and terms of such contracts, in a reasonable degree, to allow the judgment to stand finding he was of sound mind; that he was an imbecile, without contractual understanding, we have no doubt from the evidence in this record, yet it would not necessarily follow from that fact that his contracts were not enforceable. The contract of a person of unsound mind is voidable only—not void. Whether it will be avoided at the instance of the committee will depend upon the circumstances of the case."

In L. & E. Railway Co. v. Napier's Heirs, *supra,* this court said:

"The deed was not necessarily void, only voidable, and unless there was unfairness or injustice, for instance an inadequate consideration, the deed should not be set aside."

George Clay, grantor in the deed involved here, had for fifteen or twenty years lived the life of a recluse, avoiding as much as possible the society of, and intercourse with, persons of his own social standing and his relatives. His business transactions were few and simple; and he was not successful in a financial way in the management of his affairs. He was a bachelor and lived alone and quietly, with a negro man and his wife as his

servants. He was regarded, generally, as peculiar and
queer, and, by some of his relatives especially, as being of unsound mind; but many others, who knew and
occasionally saw him, considered him to be of sound mind
but eccentric. He entertained a dislike for his closest
relatives and a distrust of some of his neighbors, which
seem to have been wholly unwarranted.

Only three physicians testified as to his mental condition at the time of the execution of the deed, and they expressed the opinion largely from facts set out in hypothetical questions asked them that he was then incapable
of understanding and attending to business affairs and
was of unsound mind. Fourteen witnesses, including the
physicians testifying for appellees, said he was of unsound mind; while twenty-one witnesses for appellant,
some of them his nearest neighbors and with like opportunities for judging of his mental capacity, gave it as
their opinion that he was of sound mind. It will thus
be seen that, upon the question of his mental capacity,
the testimony was very conflicting, with its numerical
weight on the side of his sanity. Yet, upon this question,
considering the uncontradicted facts of the peculiar and
unnatural life he led and the testimony of the physicians
there is such conflict at least as to leave our minds in
doubt, and we must, therefore, accept as conclusive- the
finding of the chancellor that, at the time he executed the
deed, he was of unsound mind.

Whether the unsoundness of mind of George Clay was
of such character that it would impress itself upon those
having business transactions with him, or was discoverable only upon the fullest inquiry, was, until he was
adjudged insane, a matter of much doubt, about which
different persons who saw and knew him, in the limited
way he permitted any one to see and know him, might
reasonably have entertained, as they did entertain, quite
different opinions. We are, therefore, of opinion that appellant, although he was a neighbor and had rented land
of George Clay for a number of years and saw and conversed with him as often as, if not more frequently than
any other of his neighbors, is not to be charged with notice that George Clay was, in fact, a lunatic, but only that
he was old, peculiar and not a person of strong mind;
which necessitates, however, that the transactions with
him, just as in the case of transactions with lunatics,
be subjected to the closest scrutiny. If, therefore, it

should appear from the evidence that the grantor suffered any damage or injustice, the deed will be set aside.

It is alleged in the petition, and argued by counsel for appellees, that the trade was induced by fraud and undue influence practiced upon the grantor by appellant. There is no evidence supporting either the allegation or the argument unless the trade was, in fact, unfair to the grantor; and that depends solely upon whether or not the consideration for the land was adequate. Only therefore for inadequacy of the purchase price should the deed have been cancelled.

Upon this question, the numerical strength of the witnesses is largely upon the side of appellant, for whom twenty-one witnesses testified that the land was sold for all it was worth and that the grantor obtained the full market value for it; upon the other side, sixteen witnesses testified that whereas it sold, when reduced to a cash basis, at about $107.00 per acre, its market value was, and it was worth about $147.50 an acre. The credibility of none of these witnesses was or is questioned; and those upon one side were about as well qualified to testify as to its value as those upon the other side. It was said in Bevins v. Lowe, 159 Ky. 439, "When asserted as a ground for the cancellation of a conveyance, inadequacy of consideration must be such as will shock the conscience and constitute of itself convincing and undeniable proof of fraud or undue influence," in support of which authorities are cited. In the instant case, if we accept the testimony of the twenty-one witnesses who testified that the land was sold at its fair market value there was not such inadequacy in the purchase price as would shock the conscience and constitute of itself convincing and undeniable proof of fraud or undue influence, or any inadequacy of consideration whatever. It is only if we entirely disregard this evidence and accept the testimony of the sixteen witnesses who testified for appellees that the land was worth $147.50 an acre, that the purchase price could be said to be inadequate and to authorize the cancellation of the deed. There are two reasons, from the evidence, why we can not accept the testimony of the witnesses for appellees, rather than those for appellant, as to the market value of the land. In the first place, the value fixed by the witnesses for appellees is based upon a sale of the tract as a whole, whereas, by the sale actually made, the grantor reserved

to himself for his lifetime fifty acres, including the improvements, on the front of the place and facing the turnpike. This reservation would unquestionably affect the price that most, if not all, prospective purchasers would be willing to pay for the land as well as deter many persons from buying at all. This reservation by the grantor was a most natural and reasonable one, even if it interfered with a sale on the most advantageous terms. He had spent his whole life on this farm and naturally desired to remain there so long as he lived; and this was to grantor, as it would have been to a person of sound mind, a sufficient reason and a valuable consideration for selling the land with the reservation, even though it might have to be sold at a less price than it would otherwise have been sold. Again, it is shown that, about the same time the grantor sold his farm, five other farms in the immediate vicinity were sold without any reservations, at voluntary sales and for less per acre than grantor received for his farm. We, therefore, conclude that the evidence largely preponderates that the consideration was adequate; and that the grantor conceding he was of unsound mind when he made the deed did not suffer any damage or injustice by reason of the transaction.

We cannot agree with counsel for appellees that the proved value of the land was $125.00 an acre, arrived at by taking the general average of the values placed thereon by all the witnesses. In the first place, upon the sharply drawn issue as to whether the land was worth about $107.00 or $147.50 an acre, we must accept one or the other of these values, as no witness fixed its value at what would be the general average of all; and in the second place, such average fails to take into consideration the manner in which the land was sold. The reservation made by him had some appreciable value to the grantor, as it permitted him to sell so much of the land as he confessed he did not need and could not manage and to retain, during his life, such part of the farm as he desired to retain. It also disregards the evidence as to sales of other land, about the fairness and regularity of which there can be no question, made in the regular course of business, about the same time, and in the same vicinity. None of these other tracts was in any worse condition, as to fertility and improvements, than the land involved here; none brought a greater price per acre; some of them sold for considerably less. While there is

some proof that these other lands were of less value, there is much proof that they were of equal or greater value than the land involved here. That such evidence is competent has, many times, been recognized by this court, and in Chicago, St. L. & N. O. R. Co. v. Rottgering, 83 S. W. 584, 26 Ky. L. R. 1167, we said:

"Such sales when made under normal and fair conditions are necessarily a better test of the market value than speculative opinions of witnesses, for truly here is where money talks."

This statement of the value of such evidence was approved in the recent case of West Kentucky Coal Co. v. Dyer, 161 Ky. 407, 170 S. W. 967. See also City of Paducah v. Allen, 23 Ky. L. R. 701; L. & A. & P. V. Elec. Ry. Co. v. Whipps, 118 Ky. 121; Railway v. Clark, 121 Mo. 169, 26 L. R. A. 759.

The evidence of one witness, greatly relied on by appellee, should, no doubt, on that account be specially noticed. Counsel for appellee insists that Mr. F. A. Wallis, a short time before the sale, offered grantor $150.00 an acre in cash, or its equivalent; and that his refusing this offer and making a sale so soon thereafter, at such a reduced price, are conclusive evidence both of his lunacy and of the gross inadequacy of the price he received for his farm. Wallis did not make any such proposition for the land. He testified that George Clay asked him $170.00 or $175.00 an acre; that he then asked Clay if he would consider $150.00 an acre; that grantor said, "no"; that he did not know just what he would have been willing to give, but he did offer him $140.00 an acre, which he refused; that, since that conversation, he had learned that there was some pretty thin land on the rear of the place; and that, at that time, he was judging of its value from what he saw of the farm as he went up and down the pike, but it was still (when he was testifying), his impression that $140.00 an acre would have been a reasonable price for it. This value was presumably upon the basis of a sale of the entire farm, without a reservation, for the uncertain period of grantor's life, of the best located and strongest one-sixth of the farm, upon which were all the improvements, including the brick and frame dwelling house, referred to, it is true, by some of the witnesses as a negro cabin, but nevertheless having considerable value, for it was the only residence on the farm and, as admitted by appellee, was insured by him for

$2,000.00. So, this witness, instead of making a case for appellee, was, in fact, not an especially strong witness on his side, for he admitted he knew personally but little of this particular farm, or of the land in the vicinity, as he was in business principally in New York City, although he and his wife owned considerable land in the neighborhood, and that he depended largely upon his father-in-law's judgment in such matters. Besides, he confessed, on cross-examination, that he thought $150.00 an acre was too high for a very much better improved and cared for farm on the opposite side of the pike, when he had the purchase of that farm under consideration, and so expressed himself; yet, the evidence is conclusive that that farm was worth considerably more per acre than the George Clay farm.

From all the evidence, we are convinced that the price at which the grantor sold the land was not inadequate, certainly not so inadequate as to "shock the conscience and constitute of itself convincing and undeniable proof of fraud or undue influence," which, as was said in Bevins v. Lowe, *supra*, must be the case to warrant the cancellation of the deed; and, conceding that the grantor was of unsound mind, the sale was unaffected thereby and he suffered no injury or injustice therefrom. Equitable grounds, warranting the cancellation of the deed, are, therefore, wanting and the court erred in ordering its rescission.

Wherefore, the judgment is reversed and cause remanded with directions to dismiss the petition.