## McVeagh, By, etc. v. Hicks, et al.

### (Decided November 17, 1925.)

### Appeal from Graves Circuit Court.

1. Bills and Notes—Evidence Held Sufficient to Support Finding that Notes were Purchased in Good Faith for Value Before Due.—In action to cancel deed, and for return of notes given therefor alleged to have been procured by fraud, held evidence was sufficient to support finding that notes were purchased by assignor in good faith before due for value without notice of any infirmity therein or defense thereto.

2. Insane Persons—Evidence Held Sufficient to Show that Purchase of House by Person of Unsound Mind was Without Fraud.—In action to cancel deed and for return of notes given therefor alleged to have been procured by fraud, held, that evidence was sufficient to support finding that holder in due course was entitled to recover on the theory that sales made by persons of unsound mind will not be set aside, where price was fair and no inequity was done to person laboring under disability.

J. E. WARREN for appellants.

JOE W. BENNETT and ROBBINS & ROBBINS for appellees.

OPINION OF THE COURT BY JUDGE SAMPSON—Affirming.

The two negotiable notes of $1,075.00 each, the subject of this litigation, were executed by Lelia McVeagh to Mrs. M. D. Witherspoon August 18, 1922, one falling due November 1, 1922, and the other April 1, 1923. In the last days of October, 1922, Mrs. Witherspoon, payee in the notes, sold and transferred the notes for value to appellee, Hicks, making the following endorsement on each note: "I assign the within note to H. A. Hicks without any recourse on me."

There was a precipitating clause in the notes and the notes were secured by a lien on a house and lot sold by Mrs. Witherspoon to Mrs. McVeagh; and also by two

or three promissory notes owned by Mrs. McVeagh and attached to the notes in controversy as collateral. When the first note fell due Hicks, through his attorney, presented the note for payment to Mrs. McVeagh, who said she did not have the money to pay it. In a day or so thereafter suit was instituted by Hicks against Mrs. McVeagh upon the two notes, with prayer for enforcement of the mortgage lien, and also for a sale and application of the proceeds of the collateral notes to pay Hicks' claim. Shortly after the filing of the suit Mrs. McVeagh was declared, by a judgment of the county court, to be mentally incapable of transacting her business, and Mrs. Katie Kirby was named as her committee. The committee thereupon instituted an action in the Graves circuit court against Mrs. Hicks and Mrs. Witherspoon and her husband for a cancellation of the deed conveying the house and lot to Mrs. McVeagh and a cancellation of the notes sued on and for the recovery of the collateral notes passed by Mrs. McVeagh to the Witherspoons and later transferred by the Witherspoons to Hicks when they sold Hicks the McVeagh notes. That suit was later consolidated with the one by Hicks upon the notes and the two heard together and disposed of in one judgment.

The answers pleaded the incapacity of Mrs. McVeagh to attend to her business and the orders of the court appointing Mrs. Katie Kirby as committee for Mrs. McVeagh. It was further alleged in the answer that Mrs. Witherspoon and her husband fraudulently induced Mrs. McVeagh to purchase the house and lot for which the notes were given and to execute the notes and put up the collateral for the purpose of cheating and defrauding Mrs. McVeagh out of her property at a time when Mrs. McVeagh was mentally incapable of understanding the transaction or attending to any business and that the whole transaction had by Mrs. McVeagh with the Witherspoons was void and of no force, and that her notes, the subject of this litigation, were invalid for the same reason and should be cancelled; that the collateral notes put up by Mrs. McVeagh to Mrs. Witherspoon should be restored to her and she allowed to take and collect them.

As C. Norman Edwards had a claim against the house and lot in question for several hundred dollars, and the Water Valley Lumber Company also had a large claim against the same property for materials furnished and used in the building of the house, each of them was

made a party defendant that they might set up their claims and have the whole matter adjusted in one action. Each of these defendants filed answer asserting their claim. Much proof was taken upon the different issues made by the pleadings, and the court, after the consolidated cases were submitted, rendered a judgment in favor of Hicks against Mrs. McVeagh upon the two notes of $1,075.00 each, and adjudged the house and lot in lien to Hicks for the payment of this amount, less a credit of $200.00 paid by Mrs. McVeagh on the notes; and also adjudged the defendant, Edwards, and the Water Valley Lumber Company liens upon the same house and lot.

For appellee, Hicks, it was proven that the defendant, Jap Witherspoon, husband of Mrs. M. B. Witherspoon, approached appellee, Hicks, a short time before the suit was brought and told Hicks that he needed some money with which to pay a debt of $1,400.00, with interest, and must have it; that he was about to be sued, and in order to raise the money offered to sell or assign to Hicks the two notes in question made by Mrs. McVeagh; that after some negotiations Hicks bought the notes from the Witherspoons at a discount of $150.00, giving his check for the amount, and this check was immediately taken by Witherspoon and his wife, who owned the notes, to the bank and cashed; thereupon Withersoon paid his creditors the $1,400.00. They also proved that Hicks had to borrow part of the money and deposit it in bank before he could give a check. It is also proved by the evidence of several witnesses, including Mrs. Kirby, that Mrs. McVeagh, a lady about seventy-two years of age, was mentally unsound and unable to contract or to understand a contract of the nature of the one by which she bought the house and lot in question, and gave her notes in part payment. To substantiate this it was proven that Mrs. McVeagh had been married four times and had three living husbands; that she lived with the last one only ten months and had a disagreement which caused him to leave her; that she had a mania for marrying, and for buying real property which she did not need; that on a recent occasion she had purchased a house and lot in a town in Tennessee in order to be close to a man much younger than herself with whom she was infatuated. Mrs. Kirby testified for the appellant and stated that she informed the Witherspoons shortly before the deal was closed selling the house and lot to Mrs. McVeagh that Mrs. McVeagh was not mentally competent

to enter into such a contract and that she would soon be dissatisfied with the house and would want to return the property and be released, and asked the Witherspoons not to enter into the trade with her, but that notwithstanding this suggestion and request from her the Witherspoons continued to carry on negotiations which resulted in the sale of the house and lot to Mrs. McVeagh; that the Witherspoons knew or from this information should have known that Mrs. McVeagh was mentally incapable of transacting business and of making a valid contract, such as is evidenced by the notes. It is further attempted to be shown that the house and lot in question was located in a small town in Graves county, several miles from the county seat, and was of much less value than the price which Mrs. McVeagh contracted to pay; that the lot cost about $400.00 and the residence, containing eleven rooms and bath, cost about $4,000.00; but that property had depreciated in value in that town and that it had been offered by the Witherspoons to other persons for $2,800.00, whereas they sold it to her for $3,500.00. In contradiction of this evidence the appellees testified and proved by other witnesses that Mrs. McVeagh was a woman apparently in good mental condition at the time of the execution of the notes and that the price she agreed to pay for the house and lot was no more than its fair cash value and that they did not know or suspect that she was mentally unsound, if indeed she was at that time; that after making the trade and taking notes for their property they, in good faith and for the purpose of meeting their own obligations, began to look for some one to whom they could transfer the McVeagh notes for money and finally found appellee, Hicks, to whom they sold and transferred the notes at a discount in order to get ready cash; that they did not convey to Hicks any information concerning the condition of Mrs. McVeagh, nor did they know of any defense she then had to the notes; that Hicks paid them $1,800.00 for the notes and they used part of that money in paying their debts. Hicks testified he did not know or have any information that Mrs. McVeagh was incapacitated mentally, or otherwise, if she were, at the time of the making of the notes or at any time, and that he bought and paid for the notes in the regular course of business, taking them before due for value. He said he had never known Mrs. McVeagh except by reputation; that he understood she was a wo-

man owning property of considerable value and came of a family of people who had large property interests. For appellees it was proven that the house and lot cost more than $4,000.00, and was of a reasonable value at the time of the sale of $3,500.00.

It is upon the foregoing evidence that the chancellor concluded that there was no fraud in the transaction and that the notes were enforceable. In brief of counsel it is said the court concluded that there was no inequity in the deal because the property was well worth the price paid. However, the reasons controlling the chancellor were not set out in the judgment. If, as contended by appellee, Hicks, he purchased the notes in good faith before due for value without notice of any infirmity therein or any defense thereto, the chancellor was correct in adjudging appellant, Mrs. McVeagh, pay the notes. The evidence was sufficient to support such a finding. It was also sufficient to support the finding based upon the ruling followed in the case of Clay v. Clay's Committee, 179 Ky. 494, to the effect that sales made by persons of unsound mind will not be set aside where the price was fair and no inequity was done to the person laboring under disability. We are satisfied that the finding of the chancellor is abundantly supported by the facts upon either of the grounds to which we have referred.

Finding no error in the judgment it is affirmed.