ELIZA R. P. CHRISTIAN, AN INCOMPETENT PER-
SON, BY HERMAN V. von HOLT, HER GUARD-
IAN, *v.* WAIALUA AGRICULTURAL COM-
PANY, LIMITED, JAMES L. HOLT AND ANNIE
HOLT KENTWELL.

No. 2078.

Argued April 28, 29, 1933.          Decided May 3, 1934.

Perry, C. J., Banks and Parsons, JJ.

OPINION OF THE COURT BY PERRY, C. J.
(Banks, J., dissenting.)

For earlier history of this case see *Christian* v. *Waialua Agricultural Co.*, 31 Haw. 817-912.

Subsequent to the order of this court remanding the case to the circuit judge for further proceedings, application was made by the petitioner before the circuit judge for leave to amend the petition by adding allegations to the effect that at the time when Eliza Christian executed

the lease of March 17, 1905, and the instrument of August 31, 1906, she was mentally incompetent to execute those instruments, received no consideration for either of them and was not in any way benefited by their execution; and that both instruments were wholly void and should be set aside. Objections to the allowance of these amendments were presented by the respondent, the Waialua Agricultural Company, Limited, hereinafter referred to as the W. A. Co., and were overruled. The W. A. Co. (it was the only one of the respondents which offered any resistance to the granting of the prayer of the petition) demurred to the petition as amended and subsequently filed an answer in which it claimed in effect that neither on March 17, 1905, nor on August 31, 1906, was Eliza mentally incompetent to execute those instruments, that she received adequate consideration for each of them, that they were beneficial to her and in her interest and that they ought not to be canceled. Subsequently the W. A. Co. offered to produce evidence tending to show that on March 17, 1905, on August 31, 1906, and on May 2, 1910, the latter being the date of the deed which by former order of this court was to be canceled, Eliza was mentally competent to execute each such instrument. In various ways it made this offer and there can be no doubt that it presented to the lower court and preserved for the consideration of this court the question whether it was entitled to produce further evidence on the subject of the mental competency of Eliza to execute each of the three instruments referred to.

In so far as the deed of May 2, 1910, is concerned, it is clear that no error was committed by the trial judge, in these proceedings on remand, in refusing to admit further testimony or other evidence on the subject of Eliza's mental competency on the date of the execution of that

deed. At the original trial about 116 witnesses testified, pro and con, on this issue. At that time both parties had their day in court on that subject and made very extensive use of the opportunity thus afforded them for presenting evidence in support of their respective claims. That evidence received very careful consideration at the hands of this court on the first appeal and a finding was then made with reference to the mental condition of Eliza, to-wit, that she was a congenital imbecile. There must be an end to litigation. The respondent, as well as the petitioner, had ample opportunity to procure and present its evidence of mental competency with reference to the execution of the deed of May 2, 1910, and no reason, either of law or of justice, occurs to us why a second opportunity, with reference to that deed, should be given to the respondent. The finding that on May 2, 1910, Eliza was a congenital imbecile and incompetent to execute the deed of that day is reaffirmed.

The question of the admissibility of the testimony of mental competency, when considered with reference to the lease of 1905, and to the instrument of 1906, did not stand upon precisely the same state of facts. If there was error in the exclusion of the offered testimony in so far as it related to Eliza's mental condition on March 17, 1905, and on August 31, 1906, it was not the error of the trial judge. He construed correctly the order of remand made by this court. It was our understanding and intention in making that order that the finding of mental incompetency, of congenital imbecility, was not to be reopened or disturbed by the circuit judge upon the proceedings on remand even when considering whether those two earlier instruments or either of them should be canceled. If there was error, it was the error of this court in thus restricting the issues for the trial on remand. We

think that we did err in that respect. As expressly held in the former opinion, neither the lease of 1905 nor the instrument of 1906 was a subject of contention between the parties at the original trial. It is true that there was an allegation in the petition that on March 17, 1905, Eliza was mentally incompetent to execute the lease of that day but that was followed by an express statement that "relief in equity against said lease need not be and cannot be herein prayed for, respondent's sole claim of right to the said lands being now based upon the said deed of May 2, 1910," and in its answer the respondent expressly accepted that statement as correct, that relief in equity against the lease could not be prayed for or had. It cannot correctly be said that the lease of 1905 was in issue at the original trial when both parties expressly represented to the court and to each other in their pleadings that that lease was not in issue. The prayer was for the cancellation of the deed of May 2, 1910. There was no prayer for the cancellation of either the lease or the instrument of 1906. When therefore, under these circumstances, the petitioner was permitted by amendment to put the two earlier instruments in issue, it followed as a correlative and necessary right on the part of the respondent that it should be permitted not only to file an answer with respect to the new allegations but also to defend with evidence against the new prayer for the cancellation of the two instruments and the new charge that Eliza was mentally incompetent at their respective dates to execute them. It is true that a very large number of witnesses, as above stated, had already testified on the subject of Eliza's condition of mind but her condition on March 17, 1905, and on August 31, 1906, not being among the ultimate things involved the respondent might well have been led not to make any search for evidence relating to her condition on those two

particular dates. The respondent's offer was not only to introduce evidence of Eliza's mental condition on the two earlier dates but it was also to present the testimony of one or more experts to the effect that the degeneracy in congenital imbecility grows with the lapse of time. In other words, the offer was to prove that Eliza's mental condition in 1905 and 1906 was not as weak or insufficient as it was in 1910, even assuming that she was incompetent in 1910. There may be, on the part of the members of the court who examined the evidence on the original trial, a temptation to believe that in spite of any new evidence to be adduced their conclusion concerning the degree of Eliza's imbecility would not be affected thereby. Nevertheless the court should not venture any such surmise. The evidence was offered and in our opinion the respondent should have been given an opportunity to present it,—with reference only to its effect on the lease of 1905 and the instrument of 1906.

For other reasons, however, which are about to be stated, this error in the exclusion of evidence was not prejudicial to the respondent. It may be assumed for the purpose of this phase of the case that on March 17, 1905, and on August 31, 1906, Eliza was an imbecile and mentally incompetent to execute either of those instruments. In our former opinion it was held, after careful consideration, that the better view of the law is that the deed or contract of a mentally incompetent person, who has not been judicially declared insane and whose incompetency is unknown to the other party to the transaction, is not absolutely void but is voidable only and that "in determining whether it should be canceled the nature of the transaction in all its aspects and the good or bad faith of those dealing with the grantor in respect to such transaction should be carefully considered" (31 Haw. 888).

In other words, a deed, lease or other instrument of one mentally incompetent is not to be canceled solely because the person was incompetent but in determining whether it should be canceled all of the equities must be considered, including those in favor of the grantee or lessee as well as those in favor of the grantor or lessor. In the case at bar, as already held, while Eliza was an imbecile and mentally incompetent the W. A. Co. had no knowledge of that incompetency at the time that it dealt with her in 1910. The same must necessarily be true as of 1905 and 1906. Eliza had not been judicially declared incompetent. What are the other surrounding circumstances affecting the lease? Eliza was not the only lessor. Other lessors were Carlos A. Long, as administrator of the estate of R. W. Holt, Robert L. Colburn, George H. Holt, Edward S. Holt, Helen A. Holt, individually and as guardian of her minor children, Elizabeth K. Richardson and the Hawaiian Realty & Maturity Company, a corporation, acting by its president and its secretary. Still other parties (of the third part) were John F. Colburn and James Lawrence Holt. All of these other parties to the lease, except the children of Helen Holt, were of age and in every way competent to transact their own business affairs and to enter into this contract. The negotiations for the lease were instituted by John F. Colburn, a business man who had some interest in the matter in the capacity of a trustee, by Carlos A. Long, who was an attorney at law, and by C. W. Ashford, also an attorney, who served for some years as one of the judges of the circuit court of the first circuit. Mr. Ashford acted in the matter as attorney for John F. Colburn and perhaps others of the parties lessor. In the evidence there is to be found no reflection whatever upon the mental capacity, the integrity or the business ability of any of the parties

lessor other than Eliza. The assumption must be that they were all competent and faithful as well, at least, as ordinarily keen business men. The lease was for a term of twenty-five years from April 1, 1905, and the total rent was at the rate of $9,000 per annum for all twenty-seven twenty-sevenths undivided interests in the lands that were being demised (the W. A. Co. at that time owned a small undivided interest in the lands). The precise terms which were incorporated in the lease were largely if not wholly of the seeking of those who negotiated on behalf of the lessors. They were satisfactory to every one of the competent lessors. Not a word of evidence has been introduced in this case tending to show that the terms secured by the lessors were not the most favorable that could have been secured in 1905. Apparently the W. A. Co. was the only entity that at that time was in a position to make profitable use of the property. The land at that time was wholly uncultivated and covered with noxious weeds, including such well-known pests as lantana and klu. The taxes at that time were four years in arrears. The Holt estate was not in a position to pay them. The lessee undertook to pay the taxes as well as the remainder of the prescribed rent. The consideration that the W. A. Co. undertook to pay for the use of the lands under the lease was adequate. At the date of the lease Eliza's interest was purely contingent but it was within the possibilities that it would become vested shortly after the execution of the lease and for that reason it was important to the lessee to secure that interest, such as it was, as well as the other more definite vested interests. If her interest had vested soon after the date of the lease, Eliza had no funds with which to pay the accruing taxes. She, as well as other lessors, were in some danger of losing their title and interests through enforcement of the government's

claim for taxes, past and future. We think that Eliza's joinder in the lease was wise and beneficial. It enabled her to secure support and maintenance for herself, as will more clearly appear when the instrument of 1906 is under consideration. If, in February or March of 1905, Eliza (by guardian) had by proper petition applied to a court of equity for leave to join in the lease it seems to us that the court of equity so applied to, upon a showing of all of the surrounding circumstances as they existed and as they have been hereinabove recited, would readily have granted the application; and if this is so how can a court now, after the fact, after the lapse of the full period of the lease, after the performance by the lessee of all of the requirements of the lease on its part to be performed, with any propriety cancel the lease? To do so would be to hold in effect that there is no such thing as refusing to cancel an instrument which has been executed by a person mentally incompetent. This lease was for an adequate consideration. All of its terms were fair and reasonable to the lessee and to the lessors. It has been fully performed. It was in the best interests of Eliza and beneficial to her, —fully as beneficial as it could have been if it had been secured and entered into under the careful supervision of a court of equity. There was no fraud, actual or constructive. The imbecility of the lessor did not enter into the transaction. Under these circumstances we can see no equity or justice in canceling the lease.

The only reason which can be suggested as an equity in aid of canceling the lease and the instrument of 1906 is that by doing so Eliza will now be enabled to collect as rents very much larger sums than she was entitled to under the lease. This is not a good reason nor does it constitute an equity, properly so called, in her behalf. At the time of the execution of the lease and even later, at

the date of the instrument of August 31, 1906, it was not known to any of the parties or to any one else that pineapples could be successfully or profitably grown on the upper lands of the Holt estate. It was not until about fifteen years later that the W. A. Co. was able to lease the upper lands for pineapple purposes at large rentals. If Eliza had been a perfectly sane lessor and had come forward in 1928, or in 1923, with a request to set aside her lease because the lands thereby demised were of very much greater rental value than that specified in the lease, the courts would have said, in effect, "You must stand by your contract even though it has proven more profitable to the lessee than you and it supposed in 1905." Courts should not now enable her to do that which she could not have done lawfully if she had been sane. It is not an equity in her favor that she leased the land for less than its rental value of fifteen or more years later. She leased it in 1905 for all that it was then worth on the market. It would be inequitable to the lessee to permit a lessor, sane or insane, subsequently to cancel a lease on the ground of greater values subsequently developed, acquired and ascertained.

It is our view of the law that a lease made by an incompetent, who has not been judicially declared insane, to a lessee without knowledge of the incompetency, for an adequate rental and upon other terms that are reasonable and fair, which is beneficial to the incompetent and is in effect a provision in favor of the incompetent for necessaries for his sustenance and comfort,—a lease which has been fully performed and is accompanied by no fraud or other circumstances of inequity to the incompetent,— should not be canceled,—even though the lessee can be restored to the *status quo ante*.

"Where indeed a contract is entered into with good faith and is for the benefit of such persons, such as for

necessaries, there courts of equity will uphold it as well as courts of law." 1 Story's Eq. Jur. (14ed.) §318. This, *inter alia*, was quoted with approval in our former opinion (31 Haw. 885). We do not understand this statement of Story's to be in any way qualified by the next succeeding sentence: "And so if a purchase is made in good faith without any knowledge of the incapacity, and no advantage has been taken of the party, courts of equity will not interfere to set aside the contract if injustice will thereby be done to the other side, and the parties cannot be placed in statu quo, or in the state in which they were before the purchase." The introductory "and" indicates that the succeeding sentence is not a repetition of what was said in the sentence first here quoted but deals with a somewhat different state of facts. It is to be noted that in the second sentence no reference is made to the element of "benefit" to the incompetent or of the contract being "for necessaries;" and the second sentence adds the element of necessity of restoration to the *status quo* when it does not appear that the contract was for the benefit of the incompetent, as for necessaries.

Judge Story (14 ed., §317), also quoted in 31 Haw. 885, further says: "The ground upon which courts of equity now interfere to set aside the contracts and other acts, however solemn, of persons who are idiots, lunatics, and otherwise non compotes mentis, is fraud. Such persons being incapable in point of capacity to enter into any valid contract or to do any valid act, every person dealing with them, knowing their incapacity, is deemed to perpetrate a meditated fraud upon them and their rights. And surely if there be a single case in which all the ingredients proper to constitute a genuine fraud are to be found it must be a case where these unfortunate persons are the victims of the cunning, the avarice, and corrupt influence

of those who would make inhuman profit from their ca-
lamities. Even courts of law now lend an indulgent ear
to cases of defence against contracts of this nature, and if
the fraud is made out will declare them invalid." It is
important to bear in mind that, as thus stated by Judge
Story, the ground upon which courts of equity interfere
to set aside the contract of an imbecile is *fraud*. If, there-
fore, the surrounding circumstances and the evidence
show clearly that there was no fraud, actual or construc-
tive, but that on the contrary the contract entered into by
the imbecile and by others, all as lessors, is in every way
fair, favorable and beneficial to the imbecile and is one
which a court of equity, if appealed to in advance of its
execution, with knowledge of all the circumstances, would
advise and authorize the guardian of the imbecile to exe-
cute as being in the best interests of the ward, a cancel-
lation of the contract would not be justified. In such a
case the imbecility does not enter into or contribute to
the transaction.

"The mere fact that a party to an agreement was a
lunatic will not operate as a defense to its enforcement,
or as ground for its cancellation. A contract executed
or executory made with a lunatic in good faith, without
any advantage taken of his position, and *for his own bene-
fit*," (the italics are the author's) "is valid both in equity
and at law. And where a conveyance or contract is made
in ignorance of the insanity, with no advantage taken, and
with perfect good faith, a court of equity will not set it
aside, if the parties cannot be restored to their original
position, and injustice would be done." 2 Pomeroy's Eq.
Jur. (4 ed.) §946. This was also quoted with approval
in our former opinion (31 Haw. 887). In this instance
also the second sentence, similarly introduced by "and,"
adds a statement of the necessity of restoration to the

*status quo* when the fact that the instrument was for the benefit of the incompetent is not a feature in the case. This view is further strengthened by the fact that the author italicized the words "for his own benefit" in the first sentence. That to his mind was an important element of the circumstances stated by him which would leave the contract "valid both in equity and at law," without consideration of the *status quo*.

"The tendency of the modern decisions is to broaden out the rule above stated, and to refuse rescission or cancellation of any ordinary contract or conveyance of an insane person, if it is shown to be fair, reasonable, based upon an adequate consideration, and beneficial to the afflicted person, although, of course, inadequacy of consideration or any misrepresentations as to value of the subject-matter will be held fatal to such a contract." 2 Black on Rescission and Cancellation (2 ed.) §256.

"An exception to the general rule that persons of unsound mind are not bound by their contracts is to be found in contracts for necessaries for the lunatic himself." 16 A. & E. Ency. L. 625.

"It has been held in many cases that even where the contracting party was shown to have been suffering from impaired mental faculties, yet if the transaction in question was fair and honest and what the party might reasonably be expected to do under all the circumstances, courts will not set aside such a transaction, for the reason that the mental lack has not entered into the act." *Rieckhoff* v. *Goddee,* 215 Ill. App. 141, 144.

"Courts of equity ever watch with a jealous care every contract made with persons *non compos mentis,* and always interfere to set aside their contracts however solemn, in all cases of fraud, or when the contract or act is not seen to be just in itself, or for the benefit of such

persons; but when a purchase is made in good faith, without knowledge of the incapacity, and no advantage is taken, for a full consideration, and that consideration goes manifestly to the benefit of the lunatic, courts of equity will not interfere therewith. 1 Story Eq., §§ 227, 228; 1 Chitty on Contracts, 191; *Molton* v. *Camroux*, 2 Exc., 487. If a court of equity in any case sets aside the deed of a *non compos,* it will ordinarily administer the equity of having him to pay back to the other party the money or other thing received of him. And when it appears that the consideration is full and the lunatic is not able to put the other party *in statu quo,* or, if the benefit received is actual and of a durable character, in either case, the courts of equity will not be inclined to set aside the conveyance. *Carr* v. *Holliday,* 1 Dev. & Bat. Eq., 344, and same case, 5 Ired. Eq., 167." *Riggan* v. *Green,* 80 N. C. 175, 176, 177 (30 Am. Rep. 77, 79).

"When it appears that the consideration is full and the lunatic is not able to put the other party *in statu quo,* or if the benefit received is actual and of a durable character, in either case, the courts of equity will not be inclined to set aside the conveyance." 18 Ency. Pl. & Pr. 767.

"It does not necessarily follow, when there has been an adjudication by the probate court that a person is insane, that the insanity is of that character which disqualifies him from making a valid contract for necessaries." *Stannard* v. *Burns' Admr.,* 63 Vt. 244, 246.

"The trial court went off entirely on the single question of insanity, and would consider nothing else. It misapprehended the controlling principles of law which should have governed the case. * * * The great weight of authority is, that deeds of persons in fact insane, but not so adjudged, are generally held to be voidable and not absolutely void. * * * If the transaction was fair and

reasonable, and based upon a valid consideration, without fraud, and there was no circumvention, overreaching or undue advantage taken of the grantor's mental condition, and the contract was made in good faith and was fair, and was for her benefit and to her best interests, then the court ought to have sustained the deed and held it absolute under the circumstances of the case." *Green* v. *Hulse,* 57 Colo. 238, 242, 243.

"The contract of an imbecile has never been held by this court to be absolutely void but only voidable. * * * The committee for an insane person may avoid the contract of his ward if the contract be one to the disadvantage of the ward, but if the contract be one which a court of equity regards as advantageous and of lasting benefit to the ward, no rescission or avoidance of the contract will be decreed if it is otherwise enforcible. * * * This was a most equitable and reasonable contract so far as the Casebiers" (including the incompetent) "were concerned but rather burdensome, as it appears to the court, for appellant Smith" (the grantee) "for the old folks, or one of them, may live several years, in which event his undertaking would not be a profitable one to him in a financial way. * * * The best interest of the old people is the sole consideration—the only thing that concerns this court in this litigation. They are entitled to care and attention to the end of their days, and as Smith undertook to furnish this and to take pay from their estate, thus preventing them becoming a charge upon their family and their community, it was a most advantageous arrangement for them. The committee should have continued it." *Casebier* v. *Casebier, Committee,* 193 Ky. 490, 493, 494.

"It has been decided in this state and elsewhere, over and over again, that the deed of a person of unsound mind, especially before he has been adjudged a lunatic, is not

void but is voidable only. * * * The mere fact of insanity, even when clearly proved is not sufficient ground upon which to authorize a court of equity to set aside a deed; but there must, in addition, exist some other equitable grounds warranting the cancellation. If the price is adequate and the transaction fair, neither the insane grantor nor his committee has an absolute right to have the conveyance canceled and only when there is injustice or inequity will a court of equity be authorized or justified in interposing to annul a transaction and to restore the parties to the *statu quo ante*. Unless the grantor, by reason of his insanity or imbecility, has been imposed upon and has suffered some injustice, no reason exists for the cancellation of the deed; and without reason therefor the transaction cannot be disturbed. *.* * The deed was not necessarily void, only voidable, and unless there was unfairness or injustice, for instance an inadequate consideration, the deed should not be set aside." *Clay* v. *Clay's Committee,* 179 Ky. 494, 495, 496 (also referred to with approval in 31 Haw. 886).

Concerning contracts that have been fully performed it is said in 24 A. & E. Ency. L. 612, 613: "Where the contract has been fully and voluntarily performed before relief by rescission is sought, it is only where the most forceful reasons exist for granting equitable relief that a court of equity or a court exercising equitable powers will interpose to decree the rescission of the contract; and this is true even though the circumstances of the case are such that were the contract unperformed, the court would not decree the specific performance on behalf of the other party. Indeed, it has been frequently held that nothing short of actual fraud or mistake will justify the court in granting rescission of an executed contract. This rule is especially applicable where intervening rights of inno-

cent third persons would be impaired by granting rescission."

The instrument of 1906 was not signed by Eliza's husband. Under section 2993, R. L. 1925, which was in effect in 1906, "no sale or mortgage of" a wife's "real estate shall be valid without the written consent of her husband." If the instrument of 1906 was a conveyance of any interest of Eliza's in the land, it was invalid for lack of her husband's written consent. If that instrument was susceptible of two constructions, one leading to invalidity and the other to validity, it should be given the construction which leads to validity,—in order thereby to carry out the intention of the parties. The instrument contains no apt words of conveyance of an interest in land. It can only be thought to have that effect because of the rule that "a gift of the income of property is to be construed as a gift of the property itself." *In re Makaka*, 29 Haw. 815. But this is a general rule. It does not necessarily follow that because there is a gift or transfer of income from lands there is implied or results therefrom by operation of law a gift or transfer of the title to the land. The exception is as well settled as the rule itself, that if in the instrument under consideration it appears that the testator or grantor did not intend a conveyance of the land or of an interest in it there is no such conveyance. *In re Makaka, supra*, 815, 818, citing earlier Hawaiian cases and other authorities; *Rawlins v. Harbottle*, 13 Haw. 297, 300, 301. There is no indication in the instrument of 1906 of any desire or intention to convey an interest in the land. The language is clear that what is sold and transferred by Eliza is "all her title and interest in and to any and all rents, issues and profits to which she may hereafter be entitled or which may be due and payable to her by, through or under the lease to the Waialua Agricultural

Company, Limited, dated the 17th day of March, 1905.
* * * Or by virtue of being the only child of John Dominis
Holt, the elder, and devisee under the will of R. W. Holt,
deceased, together with all and every her right to demand,
receive, collect and receipt for all such rents, issues and
profits from whomsoever due during the term of the
natural life of her, the said Eliza R. P. Christian." This
language is unambiguous. There is no provision made in
the instrument for the joinder therein, in any capacity, of
Eliza's husband. The exception, therefore, and not the
rule, applies in this instance. The assignment and trans-
fer was of the rents only and not of the reversion or of any
interest in the land. In so far as appears from the evi-
dence, on August 31, 1906, as well as on March 17, 1905,
Eliza had no income or other means of support. Her
interest in the land was purely contingent. It might prove
to be, upon vesting, a one-third interest, or it might prove
to be an interest much smaller than one-third, or it might
never vest at all. For two or three years prior to March,
1905, Eliza had lived with and had been supported by
Annie Holt Kentwell, who was her cousin. By the express
terms of the instrument of 1906 Annie Kentwell under-
took to support and maintain Eliza for and during the re-
mainder of her, Eliza's, natural life. In entering into
this contract (1906) neither of the parties knew or could
know how long a period of time would elapse before Eliza
would become entitled to a share of the rents under the
lease or how much of the rents Eliza would become entitled
to if she ever became entitled to any, or that she would,
in fact, ever become entitled to any. Annie took those
chances. As events subsequently happened, a period of
seventeen years elapsed before Eliza's father died and
Eliza became entitled to any of the rents. In other words,
for seventeen years Annie performed her obligations under

the contract of 1906, supporting and maintaining Eliza, without any compensation and without any certainty as to when her compensation would begin to accrue, if at all. It is true that after the allowance of the amendments to the petition, Annie filed an answer in which she says that she "now claims no rights of any kind by virtue" of the instrument of 1906 and in effect invites a cancellation of that instrument, but neither her answer nor her present attitude can in anywise affect the nature or the status of the instrument of 1906 or the rights of the W. A. Co. thereunder. By the deed of May 2, 1910, Annie Kentwell, a mentally competent person, transferred all of her rights under the instrument of 1906 to the W. A. Co. She cannot now, by her answer in this case, cause any diminution of the rights which she transferred by her deed.

The lease of 1905 secured to Eliza a possibility, however uncertain or dim it was, of obtaining from her contingent interest in the land the means of self-support. By the assignment of 1906 she transformed that possibility, uncertain and dim as it was, into a present and real undertaking by Annie Kentwell to provide her for the rest of her days with support and maintenance. The assignment of 1906, including as it did a transfer of rents, if any, which might accrue under the lease of 1905, and transferring also the rents accruing thereafter from whatever source, was beneficial to Eliza. In effect, it was so regarded in our former opinion in this case when the assignment and Annie Kentwell's contract therein to support Eliza were referred to as being of the surrounding circumstances or elements or equities which led us to the conclusion that the deed of 1910 was not beneficial to Eliza and should be canceled. We there said: "That it was not beneficial to Eliza to dispose of her interest at the time the deed was signed is obvious. She was then living with her

father and the Kentwells at the home of the latter in Oxford. Her life, because of her imbecile condition, was very restricted and her wants were accordingly simple. There was no necessity for her to have more than enough money to supply them. Annie Kentwell, by the instrument of August 31, 1906, to which we have already referred, had undertaken to support Eliza during her life. She was in no danger, therefore, of becoming a public charge or of not being supplied with the things necessary to her sustenance and comfort. In her circumstances it would clearly be the part of wisdom to hold on to her contingent interest when by doing so she might eventually become the owner of a vested and more valuable interest. It was certainly of no benefit to her to exchange her interest for a sum of money which she did not need and which she herself did not receive" (31 Haw. 896). But if she had not had those assurances of money and support from her lease of 1905 and her assignment of 1906, the effect on the deed of 1910 might conceivably have been different. That cannot be decided now.

For the petitioner it is argued that Eliza did not receive any consideration for the lease of 1905, or for the instrument of 1906. While it is true that the rents under the lease were not paid to her even after the death of her father in 1922, that is because she had assigned them to Annie Kentwell. She was not entitled to any rent under the lease until 1922. She did, however, receive valuable consideration, both for the lease and for the assignment, in the form of support and maintenance from Annie Kentwell and is entitled, under the assignment of 1906, to continue to receive that support and maintenance during the remainder of her life. In addition, the property was preserved from tax liens and sales and was greatly improved.

While it was held in our former opinion that a con-

veyance by a mentally incompetent person who has not been judicially declared insane and whose incompetency is not known to the person he deals with, is voidable and not void, no consideration was given to the question, which had not then arisen, whether, when an incompetent conveys or assigns to one who has knowledge of the incompetency and then the grantee or assignee conveys or assigns to a third person who has no knowledge of the incompetency of the first grantor or assignor, the conveyance or assignment to the innocent third person is void or is voidable. The authorities on this point are in conflict. We think that the rule better supported by reason is that the property passes to the innocent third person freed from the taint which it received by reason of the guilty knowledge of the first grantee or assignee.

"There are two special rules on the subject which have been settled since an early day; one being a mere application of the general doctrine, and the other a necessary inference from it. The first is, that if a second purchaser, for value and without notice, purchases from a first purchaser, who is charged with notice, he thereby becomes a *bona fide* purchaser, and is entitled to protection. This statement may be generalized. If the title to land, having been passed through successive grantees, and subject in the hands of each to prior outstanding equities, comes to a purchaser for value and without notice, it is at once freed from these equities; he obtains a valid title, and, with a a single exception, the full power of disposition. This exception is, that such a title cannot be conveyed, free from the prior equities, back to a former owner who was charged with notice." 2 Pomeroy's Eq. Jur. (4 ed.) §754.

"We have repeatedly held that the deed of a person of unsound mind is not void, but merely voidable, and this being true it will not be set aside as to a *bona fide* pur-

chaser for value and without notice of the unsoundness of mind of the grantor. This is especially true as to a second purchaser of the land. * * * If a second purchaser for value and without notice purchases from a first purchaser who is charged with notice, he thereby becomes a *bona fide* purchaser and is entitled to protection." *Campbell* v. *Kerrick,* 142 Ky. 279, 280, 281. To the same effect is *Bevins* v. *Lowe,* 159 Ky. 439, 443.

"The contract of a person of unsound mind, like that of an infant, is not void, but voidable only, if made before inquest. * * * If a second purchaser for value and without notice purchases from a first purchaser who is charged with notice, he thereby becomes a *bona fide* purchaser and is entitled to protection. * * * Where a deed is not void *ab initio,* but only voidable, the title passes to the grantee and consequently a sale by him to a *bona fide* purchaser without notice passes the title." *Arnett's Com.* v. *Owens,* 23 Ky. L. R. 1409 (65 S. W. 151, 152).

"Had the defendants purchased directly from Oliver Odom for value, and without notice of his mental incapacity to make a deed, a court of equity would not ordinarily set aside the deed. * * * We do not see that the condition of the defendants is any worse because they bought mediately and not immediately. * * * If the title of an innocent purchaser for value, and without notice, can be upset for the alleged mental incapacity of one grantor, it can be done though the grantor may have been a very remote one." *Odom* v. *Riddick,* 7 L. R. A. (N. C., 1890) 118, 119.

In view of the rule which we have already adopted in this case that, when the deed of an incompetent is to a person not having knowledge of the incompetency, the deed is voidable only and not void, consistency requires that an innocent third person in the position above described

should not be placed in a worse position than he would have been in if he had been an innocent, direct taker from the hands of the incompetent. When the W. A. Co. received the deed of Annie Kentwell, of May 2, 1910, it did so, as we have already held, without knowledge of the incompetency of Eliza. In our opinion the deed from Annie Kentwell, a competent person, to the W. A. Co., did operate to transfer to the company the right which Annie had secured from Eliza by the assignment of 1906.

No decision of the United States Supreme Court holding to the contrary has been called to our attention. *Kendall* v. *Ewert*, 259 U. S. 139, is not on the point. In that case the conveyance was by an Indian, who was a common and habitual drunkard, to one Smith and about a year later Smith conveyed to the defendant Ewert. The latter considered himself legally incapable of purchasing direct from the Indian because he (Ewert) was employed at the time by the government in Indian affairs and an existing statute prohibited all persons employed in Indian affairs from having any interest or concern in any trade with the Indians. Ewert, therefore, arranged with Smith that Smith should take the deed from the Indian and then a year later should convey to him, Ewert. This program was carried out. The evidence in the case abundantly showed that at the time of the transaction between the Indian and Smith, Ewert had complete knowledge of the habits of the Indian in the matter of drinking to excess. In other words, Ewert took his deed from Smith and procured the taking of the deed by Smith as his agent, in both instances with entire knowledge of the incompetency of the grantor. There was no occasion for the court to consider, and it did not consider, what the law would be if Ewert had been an innocent subsequent grantee taking from an earlier grantee who had knowl-

edge of the incompetency of the grantor. *Dexter* v. *Hall*, 82 U. S. 9, has already been considered, at some length, by this court in its former opinion. Hall, the grantor, had been judicially adjudged to be a lunatic and at the time of the execution of the power of attorney was in confinement in a lunatic asylum under judicial commitment. Under this power of attorney the land was conveyed to persons who afterwards conveyed to Dexter, the defendant. Under these circumstances Dexter, the subsequent grantee, as well as the earlier grantee who took direct from Hall through the latter's attorney in fact, was legally chargeable with knowledge of the insanity of Hall. As stated by this court in its former opinion, Hall's confinement under commitment in the lunatic asylum "in itself was sufficient to inform any one coming in contact with him that he was in no condition to transact business and that it would be hazardous to deal with him" (31 Haw. 877). In that case, therefore, the subsequent taker took with guilty knowledge of the grantor's incompetency, as clearly as did the earlier grantees; and there was no occasion to consider, and the court did not consider, what the law would be in a case in which the subsequent grantee took innocently from an earlier grantee who had taken with guilty knowledge. And see *Luhrs* v. *Hancock*, 181 U. S. 567, discussed in our former opinion (31 Haw. 877-879).

Another question remains to be considered, with reference to the deed of 1910. In our former opinion it was held that restoration to the *status quo* could be accomplished by returning Eliza and the W. A. Co. to the position of tenants in common, which they would have occupied, after 1922, if the deed of 1910 had not been executed by Eliza, on the theory that in a partition suit a court of equity, with its wide range of powers, could secure to the

W. A. Co. a continuation of the benefit of the improve-
ments which it had erected in reliance upon the deed from
Eliza. At that time no consideration was given by the
court, as a careful examination of its opinion will indicate,
to the fact that large and costly improvements had been
constructed by the W. A. Co., in reliance upon the deed
of 1910, on lands other than Holt estate lands. More
specifically, no consideration was given to the fact of the
reconstruction in 1921 by the W. A. Co. of the Wahiawa
dam and the creation thereby of a reservoir extending back
into the mountains for a distance of several miles along
both the north and the south forks of the Kaukonahua
stream and covering about 300 acres, the reconstruction in
1931 costing the company the sum of about $210,000. Nor
was any consideration given at that time to the construc-
tion of a ditch more than four miles in length to lead the
waters from the Wahiawa dam to the cane lands of the W.
A. Co., including lands of the Holt estate as well as other
lands of the company. Similarly, no consideration was giv-
en by the court to the establishment of the Poamoho pump
by the W. A. Co. on grant 235 belonging to the Holts but
with ditches and pipe lines (on non-Holt lands) through
which the water raised by the Poamoho pump was forced
and carried to cane fields both on and off the Holt lands.
It is true that a very slight reference was made to these
improvements (which had been constructed away from
the Holt lands) in one of the briefs of the respondent filed
on the first appeal but we can find no reference to this
subject in the brief of the petitioner filed on the first
appeal. In any event, the fact remains that the existence
of these costly improvements away from the Holt lands
was not considered in the former opinion with reference
to its effect on the issue of restoration to the *status quo*.
It should be considered now.

We think that the construction of these improvements, costly though they were, on land other than Holt lands, need not prove to be an impediment to a restoration to the *status quo*. They and the land on which they are situated are the property solely of the W. A. Co. Eliza has no right, title or interest in them or in the land occupied by them. She has, however, or, after the execution and delivery of the deed from the W. A. Co. to her, will have some interest in the Holt estate land (at its southeasterly corner) on which a comparatively small part of the Wahiawa reservoir is situated and also has, or will have, a similar interest in the lands occupied by other reservoirs, pumps and other improvements erected by the W. A. Co. on the Holt lands. We think that there is much force in the argument presented by the W. A. Co. to the effect that such relief as the W. A. Co. is entitled to at the hands of Eliza should be afforded it in this suit and not left to consideration and treatment in a future partition suit. The provisions set forth in the concluding paragraphs of this opinion are intended to accomplish an equitable restoration to the *status quo*.

The W. A. Co. suggests as an impediment to the restoration to the *status quo* that the Wahiawa dam and reservoir and the Poamoho pump were constructed for the purpose of a "unified," larger sugar-cane plantation and that if the deed of May 2, 1910, is canceled and in consequence a part of the Holt estate cane lands is restored to Eliza, the company will lose a part of the use, benefit and efficiency of these costly instrumentalities of irrigation. The circuit judge, by means purely of mathematical calculation, found that the loss to the W. A. Co. of Eliza's share in the cane lands of the Holt estate would still leave the Wahiawa dam and reservoir "90% to 95% effective." The total area of the Holt lands under cultivation in cane

by the W. A. Co. is 1622.95 acres. One-third of that area, if set apart for Eliza, would be 540.98 acres. The total net area of the W. A. Co. cane land, including the Holt lands, is 9,904 acres. All of the Holt cane lands, therefore, constitute 15½% of all of the W. A. Co. cane lands and Eliza's one-third of the Holt cane lands would be a little over 5% of the total lands in cane planted by the W. A. Co. Upon partition the W. A. Co. might be deprived of 5% of its present area of cane lands upon which it could no longer use Wahiawa waters. No witness who took the stand at the trial gave any testimony categorically as to whether the efficiency of the Wahiawa dam and reservoir would be diminished in any degree by the deprivation of this 5% of cane lands. It does, however, clearly appear from other testimony, of engineers in the employ of the W. A. Co., that intermittent supplies of water from lands above Helemano (the Holt property) are used as much as possible in order to conserve the Wahiawa supply since the latter is itself somewhat inconstant. There are periods of time, occasionally, when the Wahiawa reservoir is very low, or becomes entirely exhausted and recourse at those times must be had to the Poamoho and other pumps. It is also clear from undisputed testimony that pumped waters are more costly to the W. A. Co. than waters originating in the mountains and flowing on the surface by gravity. Upon this state of the evidence the only finding can be that efficiency of the Wahiawa dam and reservoir will not be appreciably diminished by the loss to Eliza of one-third of the Holt estate cane lands, if such one-third in cane lands shall be awarded to her by the court in a future partition suit. Hence the possibility of the loss of one-third of the Holt cane lands is not an impediment to *status quo*.

Under the terms of the lease of March, 1905, all im-

provements made on the lands by the lessee were to revert to the lessor. Since the lease is being sustained, this provision should be complied with. Any improvements made solely in reliance upon the lease should be permitted to revert to the lessor. Ordinarily, improvments made by the W. A. Co. on the leased land prior to May 2, 1910, would be regarded as having been made in reliance upon the lease alone. It may be, however, that some or all of the improvements made prior to May 2, 1910, were substantially renewed or replaced after the delivery of the deed of that date. It may be, also, that some of the improvements, as for example, roads or railroads, built prior to May 2, 1910, were after that date added to in such a way as to make them essential parts of a larger system of improvements of a similar nature. All such renewals, replacements or additions made after the date of the deed cannot be regarded as having been made solely in reliance upon the lease but must be deemed to have been made in reliance upon every right possessed by the W. A. Co., including its supposed title under the deed of May, 1910. Improvements, therefore, even though made prior to May 2, 1910, which have been substantially replaced, renewed or added to after that date, cannot in equity be permitted to revert to the lessor under the terms of the lease but must be treated as though wholly constructed after May 2, 1910.

Edward S. Holt, one of the nine children of Owen J. Holt, is the owner of an undivided one twenty-seventh interest in the Holt lands. The children of Elizabeth Holt Richardson, a daughter of the same Owen J. Holt, are the owners of another undivided one twenty-seventh interest in the Holt lands. It is contended by the W. A. Co. that the existence of these outstanding two twenty-sevenths interests will require in a future partition suit the joinder of their owners as necessary parties and will place in jeop-

ardy the rights of the W. A. Co. to secure a sufficient and just restoration to the *status quo*. The answer to this contention seems to us to be that the construction of improvements by the W. A. Co., whether on or off the Holt lands, was with full knowledge on its part of the existence of these two outstanding interests and that no act or omission of Eliza's, whether by deed or lease or otherwise, has operated or could operate to affect in any way any of the rights of the owners of these two outstanding interests in a future partition suit. Whatever those rights were on the part of the owners prior to the execution of the deed of May 2, 1910, by Eliza, they have remained the same so far as that particular conveyance was concerned. In other words, in constructing the improvements, the W. A. Co. did not rely and could not have relied upon Eliza's deed of May 2, 1910, for protection against the owners of either or both of the outstanding two twenty-sevenths interests.

The only other entity mentioned as a necessary party to a future partition suit is the Territory of Hawaii. Just what the interest of the Territory is in the Holt lands does not clearly appear, although there is a suggestion in the appellant's reply brief that it would be a necessary party because of "lands purchased for school purposes." If the Territory purchased one or more lots of land for school purposes from the W. A. Co., out of Holt lands, it is inconceivable that the W. A. Co.'s interest in that regard cannot be easily protected in a future partition suit. If the record now before us shows that such a sale was made by the W. A. Co. to the Territory after May 2, 1910, Eliza can be required by the decree in this suit to convey to the Territory all of her right, title and interest in such school lands.

The Territory of Hawaii, it does appear, is the owner

of certain lands eastward and mauka of the Holt lands and adjoining the latter. The mere fact that the Territory is such an adjoining owner does not render it a necessary or proper party in a partition suit.

This subject of restoration to the *status quo* is here considered purely with reference to its effect upon the cancellation of the deed of May 2, 1910. Irrespective of the subject of *status quo* the lease of March, 1905, and the instrument of August 31, 1906, should be sustained. If sustained they afford a complete protection to the W. A. Co. against any award of rents or damages.

In our opinion the decree should provide:

### I.

That the deed of May 2, 1910, be canceled and that the W. A. Co. reconvey to Eliza all of the interest which it has acquired from her under and by virtue of that deed upon her payment to the W. A. Co. of the sum of $30,000, with interest at six per cent per annum from May 2, 1910, to the date of the final decree herein, or upon her assuring to the W. A. Co. the payment of said sum together with interest by a mortgage upon the interest so reconveyed or in any other satisfactory manner; and that the deed of reconveyance so required of the W. A. Co. be upon the condition subsequent that immediately after its execution and delivery Eliza shall execute and deliver to the W. A. Co. the deeds and grants which are in the next paragraph required of her.

### II.

(a) That, immediately after the execution and delivery to Eliza of the W. A. Co.'s deed required by paragraph I hereof, Eliza convey to the W. A. Co. all of her right, title and interest in and to (1) the land at or near the southeastern end of the Holt lands which is occupied by the waters of the Wahiawa reservoir when the waters in that

reservoir reach to the top of the spillway of the Wahiawa dam, together with additional land along the northwestern or Holt side of the Wahiawa reservoir when at its extreme height, of a sufficient width to permit of reasonable care, maintenance and use of the reservoir along that side; (2) all of that portion of grant 235 which is occupied by the Poamoho pump and its accessories and as much more as may be reasonably necessary for the convenient and effective care, maintenance and use of that pump and its accessories; (3) each and all of those portions of the Holt lands which are occupied by reservoirs, dams and camps constructed by the W. A. Co. and as much additional land adjoining each of said reservoirs (including dams) and camps on all sides thereof as is reasonably necessary for the convenient and effective care, maintenance and use thereof; and (4) all portions of the Holt lands upon which the W. A. Co. has constructed and maintains pumps and their accessories and as much land wholly around each of said pumps and accessories as is reasonably necessary for the convenient and effective care, maintenance and use of said pumps.

(b) That Eliza grant to the W. A. Co. by a good and sufficient written instrument, permanent rights of way for all ditches, flumes, syphons, pipe lines, railroads, roads, electric power lines, telephone lines and other utilities, if any, which have been constructed and are being maintained by the W. A. Co. on the Holt lands or any part or parts thereof, together, in each of the instances just recited, with additional land on each side of each such ditch, flume, syphon, pipe line, railroad, road, electric power line, telephone line and other utility above referred to, of such width as may be reasonably necessary for the convenient and effective care, maintenance and use of each such utility so referred to.

(c) That the execution and delivery by Eliza to the W. A. Co. of the deeds and grants by this paragraph II required, immediately after the execution and delivery to her by the W. A. Co. of the deed from it by paragraph I hereof required, shall be a compliance with and performance of the condition subsequent named in paragraph I above.

### III.

That the W. A. Co., by a sufficient written instrument assure to Eliza such rights of way in her behalf as may be reasonably necessary, over, under or across each ditch, flume, syphon, pipe line, railroad, road, electric power line, telephone line and other utility, if any, constructed and maintained by the W. A. Co. on the Holt lands as aforesaid, and rights of way for which are now required from Eliza in favor of the W. A. Co. under paragraph marked II hereof,—meaning hereby to assure to Eliza at the hands of the W. A. Co. such rights of way over, under or across the utilities mentioned above as may be reasonably necessary for access by Eliza and those acting under her, from each part of the common Holt lands which may be awarded to her on partition to each other part of the Holt lands which may be likewise awarded to her on partition, as well as access by her over, under or across each such utility from or to any nearby public highway to or from any part of the lands so awarded to her on partition.

That the instruments mentioned in this paragraph be executed and delivered last but immediately after the delivery of the instruments required by paragraph marked II above.

### IV.

(a) These provisions in the preceding paragraphs are intended to assure to the W. A. Co. restoration *now,* in this suit, to it of the improvements which it has constructed and

is maintaining on the Holt lands as well as the continued use and benefit of those which it has constructed off of the Holt lands.

(b) If Eliza and the W. A. Co. cannot agree upon (1) a more specific definition or description than is herein contained of the "additional" strips of land provided for in the foregoing paragraphs for the convenient and effective care, maintenance and use of the lands, utilities and ways which are specifically described in the foregoing paragraphs, and (2) an enumeration and a description of the improvements made by the W. A. Co. prior to May 2, 1910, which, under the views in this opinion expressed, should revert to Eliza under the terms of the lease of March 17, 1905, then the case will be remanded to the circuit judge for such further proceedings as may be necessary for the judicial determination of (1) the extent, definition and description of each and all of such "additional" land and (2) an enumeration and a description of the improvements made by the W. A. Co. prior to May 2, 1910, which, under the views in this opinion expressed, should revert to Eliza under the terms of the lease of March 17, 1905.

The decree appealed from is reversed and a decree or a remanding order, as the case may be, will be entered in this court upon presentation.

*Barry S. Ulrich (Ulrich & Hite* on the brief) for petitioner.

*H. Phleger* and *A. L. Castle (Brobeck, Phleger & Harrison* and *Robertson & Castle* on the briefs) for respondent Waialua Agr. Co.

DISSENTING OPINION OF BANKS, J.

I cannot agree with the majority of the court that it was error to cancel the lease of 1905 and the instrument of 1906.

It seems to be the opinion of the majority that the lease

of 1905 is incontestable by Eliza Christian for the reason that it was taken in ignorance of her imbecility and was beneficial to her. It also seems to be the opinion of the majority that the instrument of 1906 is incontestable by Eliza Christian, so far as the Waialua company is concerned, for the reason that the Waialua company purchased from Annie Kentwell, for a valuable consideration, her interest in the rents that had been assigned to her by the instrument of 1906, in ignorance of Eliza Christian's imbecility. It is also inferable from the opinion of the majority that they consider that the instrument of 1906 is incontestable by Eliza Christian, even as to Annie Kentwell, for the reason that the consideration for the instrument was the agreement of the latter to support the former during her life. I cannot agree with any of these conclusions.

Speaking of the lease the majority stated their view of the law as follows: "It is our view of the law that a lease made by an incompetent, who has not been judicially declared insane, to a lessee without knowledge of the incompetency, for an adequate rental and upon other terms that are reasonable and fair, which is beneficial to the incompetent and is in effect a provision in favor of the incompetent for necessaries for his sustenance and comfort,—a lease which has been fully performed and is accompanied by no fraud or other circumstances of inequity to the incompetent,—should not be canceled,—even though the lessee can be restored to the *status quo ante.*"

It is thought by the majority that the view that the lease is incontestable by Eliza Christian regardless of whether the Waialua company can be restored to its *status quo* is supported by the doctrine announced by Judge Story in his work on Equity Jurisprudence (Vol. 1, 14 ed.). This doctrine was quoted in the former opinion of this

court and is now requoted by the majority. I take the liberty of quoting it again (§317) : "The ground upon which courts of equity now interfere to set aside the contracts and other acts, however solemn, of persons who are idiots, lunatics, and otherwise non compotes mentis, is fraud. Such persons being incapable in point of capacity to enter into any valid contract or to do any valid act, every person dealing with them, knowing their incapacity, is deemed to perpetrate a meditated fraud upon them and their rights. And surely if there be a single case in which all the ingredients proper to constitute a genuine fraud are to be found it must be a case where these unfortunate persons are the victims of the cunning, the avarice and corrupt influence of those who would make an inhuman profit from their calamities. Even courts of law now lend an indulgent ear to cases of defense against contracts of this nature, and if the fraud is made out will declare them invalid." I see nothing in this language which justifies the conclusion that the contract of an imbecile, fairly entered into by the other party without knowledge of the imbecile's mental state and which was for the imbecile's benefit, cannot be avoided when the facts show that the *status quo* of the party claiming under the contract can be restored. What is clearly implied by Story's language is that a contract made with an idiot, with knowledge of his idiocy, is a fraud on the idiot and therefore void and that when under these circumstances the defense of idiocy is interposed to any claim made under the contract even courts of law lend an indulgent ear to it and if the idiocy is proven will declare the contract invalid. In the succeeding section (318) of his treatise, under the heading "Contracts with Person Non Compos Mentis Should Be Evidenced by Utmost Good Faith," the great author said: "But courts of equity deal with the subject upon

the most enlightened principles, and watch with the most jealous care every attempt to deal with persons non compotes mentis. Wherever from the nature of the transaction there is not evidence of entire good faith (uberrimae fidei), or the contract or other act is not seen to be just in itself or for the benefit of these persons, courts of equity will set it aside or make it subservient to their just rights and interests. Where indeed a contract is entered into with good faith and is for the benefit of such persons, such as for necessaries, there courts of equity will uphold it as well as courts of law. And so if a purchase is made in good faith without any knowledge of the incapacity, and no advantage has been taken of the party, courts of equity will not interfere to set aside the contract if injustice will thereby be done to the other side, and the parties cannot be placed in statu quo, or in the state in which they were before the purchase."

The majority are of the opinion that the portion of this section which precedes the words "and so" relates to a situation entirely different from that described in the portion following these words. Their view of this section is thus stated in the opinion: " 'Where indeed a contract is entered into with good faith and is for the benefit of such persons, such as for necessaries, there courts of equity will uphold it as well as courts of law.' 1 Story's Eq. Jur. (14 ed.) § 318. This, *inter alia,* was quoted with approval in our former opinion (31 Haw. 885). We do not understand this statement of Story's to be in any way qualified by the next succeeding sentence: 'And so if a purchase is made in good faith without any knowledge of the incapacity, and no advantage has been taken of the party, courts of equity will not interfere to set aside the contract if injustice will thereby be done to the other side, and the parties cannot be placed in statu quo, or in

the state in which they were before the purchase.' The introductory 'and' indicates that the succeeding sentence is not a repetition of what was said in the sentence first here quoted but deals with a somewhat different state of facts. It is to be noted that in the second sentence no reference is made to the element of 'benefit' to the incompetent or of the contract being 'for necessaries;' and the second sentence adds the element of necessity of restoration to the *status quo* when it does not appear that the contract was for the benefit of the incompetent, as for necessaries."

I think it is hardly fair to an author to single out any one word he may happen to have used and interpret his entire thesis by it. For instance, Story uses language which if it stood alone might be susceptible of the construction that if an imbecile conveyed property of great value to one who was ignorant of the imbecility and the consideration was the agreement of the grantee to furnish the imbecile with support during his life the conveyance must stand although the imbecile died a month after the conveyance and only one hundred dollars had been spent for his support. But when Story's entire thesis is considered I imagine no one would contend that this is what he meant. Story also uses language in the second paragraph of the section from which a sophist might argue that unless a "purchase" was involved the doctrine the author thought sound would have no application. I think no court would listen with patience to such a contention, it being evident from the context that all contractual dealings with an imbecile were under consideration.

Story was laying down what he considered equitable principles by which the respective rights of lunatics and those dealing with them should be determined. One of these principles was that if a person deals with a lunatic

in good faith and the transaction is for the benefit of the lunatic, such as furnishing him with necessaries, the lunatic should not be permitted to escape responsibility to the detriment of the other contracting party.

I do not believe that it is implicit in the language used by Story that every contract entered into in good faith with a lunatic and for his benefit should be held incontestable when it appears that the other contracting party would suffer no harm from the cancellation of the contract. This would be to withhold from these unfortunate persons the protection which courts of equity have always given them and instead of making the contract subservient to their just rights and interests would make their rights and interests subservient to the contract. The second paragraph of the text, I think, was intended by the author to make this entirely clear. His introduction of it with the phrase "and so," I believe, indicates this. The paragraph should be interpreted as though the introductory words were "therefore" or "that is to say," indicating that what followed was to be considered as corollary to or a conclusion from what preceded it. (For interpretation of the phrase "and so" and the word "so" see *Blanton* v. *State*, 1 Wash. 265, and *Clem* v. *State*, 33 Ind. 418, 431.) If the phrase "and so," as it was used by Story, is given the meaning which I think it imports, the second clause of his thesis means that contracts made with an imbecile in good faith, without any knowledge of the incapacity and without taking advantage of the imbecile, should be upheld unless the party dealing with the imbecile can be restored to his *status quo* and thus protected against injustice. Pomeroy, in his work on Equity Jurisprudence, §946, which is quoted by the majority, expresses his view of the law in almost the same language as that used by Story. In view of the cases

cited in support of their theory, which I have examined carefully, I am led to the conclusion that these authors did not intend and could not have meant to lay down a rule that simply because a contract is for the benefit of the lunatic such contract will be upheld even though the parties could be restored to *status quo*.

In further support of their conclusion the majority also quote from six cases—*Rieckhoff* v. *Goddee,* 215 Ill. App. 141; *Riggan* v. *Green,* 80 N. C. 175; *Stannard* v. *Burns' Admr.,* 63 Vt. 244; *Casebier* v. *Casebier, Committee,* 193 Ky. 490; *Green* v. *Hulse,* 57 Colo. 238, and *Clay* v. *Clay's Committee,* 179 Ky. 494.

In *Rieckhoff* v. *Goddee,* William Rieckhoff, an insane person, had a judgment against Augusta Greenberg which he assigned to defendant Goddee. William's wife, Anna, who was his conservatrix and the complainant, sought to set aside the assignment of her husband and alleged that at the date of the assignment he was insane. The defendant Goddee had made advances to William's mother, Karolina Rieckhoff, and had also given thirty dollars to William after the assignment. The majority quote the following dictum from the *Rieckhoff* case (p. 144) : "It has been held in many cases that even where the contracting party was shown to have been suffering from *impaired mental faculties,* yet if the transaction in question was fair and honest and what the party might reasonably be expected to do under all the circumstances, courts will not set aside such a transaction, for the reason that the mental lack has not entered into the act." (Italics mine) The following cases are cited by the Illinois court in support of its statement of the law: *English* v. *Porter,* 109 Ill. 285; *Kelly* v. *Nusbaum,* 244 Ill. 158; *Fitzgerald* v. *Allen,* 240 Ill. 80. An examination of these cases discloses that in the dictum the Illinois court had in mind the rule that

is applicable when there is not entire but only partial lunacy. That the quotation is only a dictum is shown by the fact that in the *Rieckoff* case the Illinois court held the assignment void because of the assignee's knowledge of the assignor's insanity, and refused to require the complainant to restore to Goddee the advances he had made.

In *Riggan* v. *Green,* plaintiffs, heirs of a lunatic, sought to recover a tract of land which their lunatic ancestor deeded to Brown and the latter to the defendants. Brown paid five hundred dollars, the full value of the land, and the money was used to extinguish an execution against the lunatic grantor. As a result of this transaction the lunatic was enabled to keep another piece of land which later descended to the plaintiffs. It is apparent from a study of that case that the reason why the court did not apply the doctrine of restoration to *status quo* was that the plaintiffs would gain nothing by rescission conditioned upon restoration. In refusing to set aside the deed the court particularly had in mind this fact as appears on page 177 of the opinion: "From such a state of facts, it would be apparent to the chancellor, and he would so decide, that a rescission of the deed would produce no benefit to the plaintiffs if coupled with the duty and obligation to replace defendants in *statu quo,* whilst it would be a great inconvenience and injustice to the defendants, and thereupon the conclusion would be not to interfere to set aside the deed, but leave the same to be operative and valid."

I agree with the *Stannard* case in holding the lunatic liable for necessaries. The only distinction I need make between the case at bar and the *Casebier* and *Green* cases is that in the latter cases no offer of restoration was made and no word on that subject was said. Therefore I believe they do not support the rule that where a contract

is for the benefit of the lunatic it will be upheld even though the parties can be placed in *statu quo*.

The *Clay* case is clearly distinguishable on its facts from the case at bar. In the *Clay* case the lunatic, George Clay, and his sister Letitia, who owned the remainder interest in the land, deeded 296 acres to S. Brooks Clay, but reserved a life interest in fifty acres. The latter paid $12,000 cash and agreed to make eleven annual payments of $2040 each with interest, evidenced by eleven notes. Brooks also agreed to pay $5000 upon the death of George, making the total consideration $39,440. Shortly after the deed was executed suit was brought to have it canceled, which relief was granted by the chancellor. The Kentucky court of appeals, in reversing the decree of the chancellor, held that the consideration was fair and covered the full value of the land. Apparently the land was of no greater value when the suit was brought than it was when the deed was made. Under these circumstances the insane person, having received the full value of the land, would have been no better off by returning the consideration and getting his land back.

Moreover, in the later case of *Cash* v. *Bank of Lowes,* 196 Ky. 570, 245 S. W. 137, the court set aside a contract which was beneficial to the lunatic. Nellie Hawkins, a lunatic, and her five children, were living with her brother Noah Wagoner on a farm. Noah held the land under a lease. Nellie and Noah desired to purchase this farm so as to acquire a permanent home. To that end a deed was obtained from the owner and Nellie executed two notes and two checks covering the purchase price of the land. R. L. Cash, who was to receive the money, presented the two checks drawn on the defendant bank. The bank refused payment on the ground that Nellie Hawkins was mentally incompetent at the time she signed the

checks. Two days later she was adjudged insane. Cash sued the defendant bank to recover on the two checks. Judgment was rendered by the lower court in favor of the defendants, and in affirming it the appellate court said (p. 573) : "The rule refusing a rescission where the contract was made in good faith before inquest does not necessarily prevail if the parties may be placed *in statu quo.* * * * Inasmuch as appellant, R. L. Cash, has a purchase money lien against the real estate which will save him harmless the parties may be placed *in statu quo.* No one a party to this record will suffer by a cancellation of the checks, notes and deed, as directed by the judgment below."

The majority also quote the following from 2 Black on Rescission and Cancellation (§ 256, p. 726) : "The tendency of the modern decisions is to broaden out the rule above stated, and to refuse rescission or cancellation of any ordinary contract or conveyance of an insane person, if it is shown to be fair, reasonable, based upon an adequate consideration, and beneficial to the afflicted person, although, of course, inadequacy of consideration or any misrepresentations as to value of the subject-matter will be held fatal to such a contract." The first case cited by Black in support of his statement of the law is *National Metal Edge Box Co.* v. *Vanderveer,* 85 Vt. 488. The first syllabus of this case is as follows: "As a general rule, equity will not set aside the fair and reasonable executed contract of a lunatic, if made in the ordinary course of business on sufficient consideration, of which the lunatic has the benefit, and the parties cannot be placed in their former state, unless the mental condition of the lunatic was known to the other party, or he was chargeable with knowledge of it," and this clearly indicates that Black had no thought of laying down the rule

which the majority think should govern the lease of 1905 and the instrument of 1906. The facts in that case were that Vanderveer and his wife executed a note and mortgage to the plaintiff company to secure a loan made by the latter to the former. The money loaned was used to pay off a former mortgage against the property of the Vanderveers who were being pressed for payment. The trial court entered a decree foreclosing the mortgage and this decree on appeal was affirmed. Under the facts it is clear enough that equity required that the plaintiff be paid back the money which it had loaned the lunatic and which was used for the lunatic's benefit. This was a complete restoration of the plaintiff to its *status quo* and was no injustice to the lunatic. But let it be supposed that instead of giving a mortgage to secure the loan the lunatic, for the same amount of money, had leased the land for a term of years and before the expiration of the lease the land had become of very much greater rental value, far in excess of the amount paid him. If the suit had, under these circumstances, been for the purpose of canceling the lease upon the condition that the lunatic return to the lessee what he had received I think under the law as I conceive it and as it was recognized by the Vermont case, the relief prayed for would have been granted. Such a decree would afford the insane person the protection which courts of equity are zealous to afford persons in that unhappy state without doing any injustice to an innocent party who had dealt with the lunatic. This is the great principle upon which equity deals with contracts between lunatics and parties who are innocent and act in good faith. I know of no case which holds that this principle is to be applied only in instances where the insane person receives no benefit and is not to be applied to instances where the insane person does receive benefit.

The rule which I think applies to the lease of 1905 finds support not only in Story and Pomeroy, as I interpret their language, but is also stated as follows in 32 C. J. 734, 735: "According to the weight of authority, however, where there has been no inquisition or adjudication of insanity, a contract, entered into upon an adequate consideration of which the insane person has had the benefit, and made by the other contracting party in good faith, without fraud or undue influence and without knowledge of the insanity or reason to suspect it, will be upheld against the insane person or his representatives, and it cannot be avoided by them, where the parties cannot be put in statu quo. * * * The right to avoid a voidable contract may be exercised where all the parties thereto can be placed in statu quo, and the good faith of the sane party will not prevent its avoidance."

Smoot in his work on The Law of Insanity, pp. 284, 285, also states the rule as follows: "The manifest hardships worked by the rule above discussed" (the "void rule") "has led to a different rule in a majority of the states where the contract of one insane is held to be voidable only. This is especially evident in the later decisions. It is contended with force that it would be highly unjust to allow a person, merely because he is mentally unsound, to enjoy the fruits of a contract without giving something in return, or that an insane person be allowed to recover back what he has attempted to convey without being required to return that which he himself has received thereunder. This is especially true where the contract is reasonable with reference to the advantage accruing under it to the non compos, and been fully executed, and the opposite party cannot be put back into the same position he occupied before the contract was entered into. It therefore seems to be the better rule, supported

by the decisions of the courts of a majority of the states, that a non compos, not under guardianship at the time of the contract in question, will not be allowed to repudiate an executed contract, where the other party to such contract has acted in good faith and without knowledge of such insanity, and cannot be put back in statu quo with reference to the matter, unless it be shown that such other party should be charged with knowledge of the insanity, that the transaction was without adequate consideration, or that there were other circumstances which would render the transaction inequitable. But where such other person can be put back in statu quo, the mere fact that the contract would have been an advantage to it will not prevent its rescission. This rule is denied by the courts of a few states, who insist that the doctrine of innocent purchaser is no defense, even where the lunatic's contract is voidable only." See also 14 R. C. L. 584; 46 A. L. R. 419; 34 A. & E. Ann. Cas. (1914D) 867; 1 Williston on Contracts 494-496. The principles announced by these writers have been many times judicially recognized and applied.

In *Czyrson* v. *Roseau County Nat. Bank,* 172 Minn. 420, Lieberg, an insane person, executed a note and a chattel mortgage to the defendant bank before his insanity had been adjudicated and at a time when he had no guardian. The money loaned by the bank was used to pay off taxes on the lunatic's homestead and to pay interest on a mortgage thereon. Lieberg was subsequently adjudicated insane and his guardian sued to cancel the note and mortgage. The trial court (p. 420) "directed that plaintiff have judgment that the note and mortgage be of no effect against Lieberg provided he or his guardian should pay a stated sum to the defendant, and that if payment should not be made, then that the note and mort-

gage remain in force." In affirming this judgment the appellate court said (pp. 421, 422): "The fact that one of the parties to a contract is incompetent although he has not been so adjudicated, does not render the contract void but only voidable; and such incompetency is no ground for setting it aside where the other party has no notice of the incompetency and derived no inequitable advantage from it, and where the parties cannot be placed in statu quo. * * * The transaction was an honest one. It was for the benefit of Lieberg. He lost nothing. It would be an injustice for the bank to lose its money and an unjust advantage would accrue to Lieberg. The circumstances and established facts do away with the fraud that is deemed to result from transactions with incompetent persons when such incompetency is known. It is the purpose of justice to protect the incompetent, not to arm him to do wrong to others. Under the law the transaction is voidable and the guardian has chosen to have it avoided. Seeking this equitable relief, the court observing the unconscionable result, imposed as a condition precedent that the bank should be paid the full sum which it expended for the purposes mentioned at the solicitation of the wife and son and of which Lieberg's estate received and still has the full benefit. This was proper."

Contracts for necessaries are without question highly beneficial to the lunatic. They are nevertheless ordinarily not binding on the lunatic, the party furnishing the necessaries being entitled, in order to protect him against injustice, to recover from the lunatic or his estate, on an implied contract, the reasonable value of the necessaries furnished him. The rule is thus stated in 32 C. J.: "Generally, when necessaries are furnished to a person who by reason of mental incapacity cannot himself make a contract, the law implies an obligation on the part of

such person to pay for such necessaries out of his own property; his liability for necessaries is deemed rather a benefit than a disadvantage to him" (§ 523, p. 739). "Since the liability is created by law the amount of the liability ordinarily is limited to the reasonable value of the necessaries furnished and not what the insane person may have promised to pay. So there may be a recovery on an express contract for necessaries to the extent of their value; and it has been held that one who lends to an insane person may recover to the extent that the money is used for necessaries, but no more" (§ 524, p. 740).

On this subject Smoot says (§350, p. 289) : "A seeming exception to the general rule that the contracts of a non compos are voidable is that which gives force to contracts for the procuring of necessities. Such implied obligation is considered as being merely confirmative of an obligation existing independent of express contracts, since under an implied contract the insane person is liable for the reasonable value of necessities furnished him and his family, if he has one. This seems to be the most universal rule, and has been held to apply to persons adjudged insane, as well as to those not so adjudged, provided, of course, the guardian himself fails to furnish the necessities. The reason for the rule is very apparent and is twofold : (1) As a matter of humanity and public policy, it is necessary that such unfortunates be provided for. Unless there was some provision for recovering the value of the necessities furnished to supply such wants, there would be little likelihood of any one doing so. In such a case, such insane person, however extensive his estate, might be reduced to an object of charity and want. (2) Under the old rule of equity, that the law will imply a promise to give quid pro quo, justice will imply a promise to pay a reasonable equivalent for the benefits actually

received, and which are necessary and proper for the insane person's comfort and protection. This has been extended to include material and services furnished for the benefit of his separate estate. It has also been held that, as the services of an attorney may be necessary to protect the property and liberty of the non compos, he will be liable for the reasonable value of legal services rendered him by an attorney, but not for any specific amount determined by the promise of the non compos." See also 14 R. C. L. §§ 41, 42, pp. 586-588, and 1 Williston on Contracts, § 255, p. 498.

*Hancock* v. *Haile,* 171 S. W. (Tex.) 1053, was a case in which the plaintiff, a lunatic, transferred his horses and farming implements to the defendant in consideration of the latter's agreement to care for the former as long as he lived unless the lunatic "should become dangerous and confinement shall become necessary." Under this contract the defendant supplied the lunatic with necessaries for almost two years, after which time he was confined in an asylum. Ten years later the lunatic was restored to sanity. After restoration and his release from the asylum he brought an action against the defendant to recover the difference between the value of the property he had delivered to the defendant and the value of the necessaries furnished him. The jury found that the plaintiff was incapable of contracting at the time he transferred his property. The trial court entered judgment for the plaintiff. In affirming this judgment the appellate court said (p.1055) : "It is also well settled that, while an insane person or a minor is bound by his contract for necessaries furnished him, the extent of his obligation thereunder is to pay the reasonable value of such necessaries, irrespective of the price which he has agreed to pay."

In *Nielsen* v. *Witter*, 111 Cal. App. 742, and *Estate of Nielsen*, 111 Cal. App. 744, Nielsen, a lunatic, paid $1500 to the defendant attorney for legal services. Subsequently the guardian of the lunatic brought an action against the attorney for the money paid him. The relief asked was not entirely but partially granted, the court holding that the lunatic was entitled to recover the sum of $250 which was the difference between the amount he had paid and what the court held to be the reasonable value of the attorney's services.

The principle that is applied in such cases is eminently just and equitable alike to the lunatic and to the party who has furnished him with such things as were reasonably requisite for his support or otherwise essential for his protection. Any other principle would be unjust and inequitable either to the lunatic or to the party dealing with him. For instance, it would be unjust and inequitable to the lunatic, who in his transactions with others is without the capacity to protect himself, to hold him unconditionally bound by his contracts. It would be equally unjust and inequitable to dismiss, without remedy, the other party who in good faith had made expenditures either of money or services for the support and maintenance of the lunatic or for the protection of his rights. And so courts of equity have evolved the great doctrine under which both parties may be shielded from injury.

Through all the fabric of the law there runs like a red thread this just and equitable thought,—if a contract is made by an imbecile with one who is ignorant of the imbecility and the consideration is fair and is for the benefit of the imbecile it is voidable and not void and will be upheld if by setting it aside injustice will be done the innocent party. Such contract will also be upheld when

after restoring to the other party what he is justly entitled to the lunatic is no better off than if the contract remained uncanceled. Equity does not trouble to interfere when the result sought would be fruitless. In other words, and to state the thought affirmatively, I think all contracts made by an imbecile should be canceled even though the other contracting party was ignorant of the imbecility, if it is to the advantage of the imbecile to cancel them and the rights of the innocent party can be adequately protected.

I come now to a discussion of the instrument of 1906. I think this instrument was absolutely void as between Eliza Christian and Annie Kentwell, and being so I think the latter conveyed nothing to the Waialua company. The evidence is undisputed that Annie Kentwell took this instrument with full knowledge of Eliza's imbecility. I think therefore that under the view of the law expressed by this court in its former opinion the instrument is void *ab initio*. In that opinion the court said (p. 873) : " * * * We think, also, that if the Waialua company, or its agents duly authorized to obtain her signature to the deed in question, had actual knowledge of her incompetency or had knowledge of facts which would put a reasonable person upon inquiry, which inquiry if honestly pursued would lead to such knowledge, the deed would, as between the parties, be entirely void."

In *Kendall* v. *Ewert*, 259 U. S. 139, the Supreme Court of the United States announced and applied this rule in the case of a deed that had been executed by a mentally incompetent grantor whose incompetency was known to the grantee. The deed was canceled without requiring the return of the consideration. The court went even further than this and compelled the grantee to discharge a mortgage lien he had created against the land and to account to the administrator of the grantor for the rents

and profits the grantee had received during the lifetime of the grantor.

I can conceive of no reason why the rule should not be applied to the instrument of 1906 as well as to a deed. In my opinion it was not rendered incontestable by the fact that the consideration for its execution was Annie Kentwell's agreement to support Eliza. Annie Kentwell, as I have already observed in discussing contracts for necessaries made by insane persons, would not, however, be left remediless in case she had furnished Eliza with necessary support. The law as established by judicial authority, being a just and righteous concept, would imply an obligation on Eliza's part to adequately reimburse Annie for her expenditures.

I cannot agree with the conclusion of the majority that because the Waialua company was an innocent purchaser Eliza is precluded from asserting her right to set aside this 1906 instrument. Since Annie Kentwell received nothing under this instrument she had nothing to convey to the Waialua company by the deed of 1910.

In *Dexter* v. *Hall,* referred to by the majority, the court had before it the question of whether a grantee of land who had for a valuable consideration and without notice of the insanity of the owner taken a deed from a prior grantee whose deed was void because of the owner's insanity was protected. The court answered this question in the negative. In other words, the court established the principle that when a conveyance of land is made under circumstances that render it void *ab initio* a subsequent purchaser from the grantee, although ignorant of the fact which renders the deed to his grantor void and although he paid a valuable consideration for the land, is defenseless in a suit to have the deed which he received canceled. So far as I know this principle has never been

abandoned or modified by the high tribunal which established it.

In their opinion the majority, in considering the *Dexter* case, say that Hall, who was the primary grantor, had been judicially adjudged to be a lunatic and was in confinement in a lunatic asylum under judicial commitment. From this the majority conclude that Dexter, who was the puchaser from Hall's grantee, had in contemplation of law notice of Hall's lunacy and therefore was not an innocent purchaser. I respectfully suggest that this conclusion is based on a factual misapprehension. This appears from the brief of Dexter's counsel. In arguing that his client should be protected because he was an innocent purchaser counsel said: "There are certain facts which should be remembered. 1. There was no proof that Hall and Dexter or Hall and Page ever met, or that Page or Dexter knew of or suspected the insanity of Hall, nor is there any evidence of unfairness, fraud, or inadequacy of price. In that case the transaction stands. * * * 3. So far as appeared, Hall had not been placed under a committee, nor had he been pronounced insane by judicial decision, and if that had not been done, his contracts are valid, no undue advantage having been taken of him in obtaining them. 4. No complaint was made that the consideration was inadequate, or that it was not fully paid by the purchaser. And there was no allegation of fraud in obtaining the power, or in executing the grant." These statements were not challenged by opposing counsel. Moreover, it nowhere appears in the opinion of the court that Dexter was denied relief because he was not an innocent purchaser but because the original deed of Hall was on account of his insanity void *ab initio*. The conclusion seems to me to be inescapable that when an instrument is void *ab initio* even subsequent innocent claim-

ants under it have no defense in a proceeding to set it aside.

It was the opinion of the court in the former appeal that under the broad powers of equity in partition proceedings the rights of the Waialua company could, upon cancellation of the deed of 1910, be fully secured. I do not understand from the opinion of the majority that there is any recession from this view. Another means of protecting the Waialua company has, however, been substituted. Under the opinion of the majority, if the parties do not make certain factual agreements, the case is to be remanded to the circuit judge with instructions to take testimony, make the necessary findings and enter a decree accordingly. This would entail further expense and delay, which I consider unnecessary. The better course, it seems to me, would be to now enter a final decree which, so far as this jurisdiction is concerned, would end the litigation.

I think the decree appealed from should be affirmed.